**FILED**
**CLERK**

3:04 pm, Jul 19, 2024

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
UNITED STATES OF AMERICA,

                                    MEMORANDUM & ORDER

    -against-                      23-CR-0197 (JS)(AYS)


GEORGE ANTHONY DEVOLDER SANTOS,

                    Defendant.
-------------------------------X
APPEARANCES
For Government:     Jacob Steiner, Esq.
                    Jolee Porter, Esq.
                    John Taddei, Esq.
                    Department of Justice - Criminal
                    1301 New York Avenue N.W., 10th Floor
                    Washington, District of Columbia  20530

                    Ryan C. Harris, Esq.
                    Anthony Bagnuola, Esq.
                    Laura Amber Zuckerwise, Esq.
                    United States Attorney's Office,
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York  11201

For Defendant:      Joseph W. Murray, Esq.
                    Joseph W. Murray
                    185 Great Neck Road, Suite 461
                    Great Neck, New York  11021

                    Andrew Leopoldo Mancilla, Esq.
                    Robert Mario Fantone, Jr., Esq.
                    Mancilla & Fantone, LLP
                    260 Madison Avenue, 22nd Floor
                    New York, New York  10016


SEYBERT, District Judge:

        Presently before the Court is the Omnibus Motion (ECF

No. 71) of George Anthony Devolder Santos (hereafter, "Defendant"

or "Santos") seeking: (1) dismissal of the aggravated identity

theft charges (Counts Six and Ten) of the Second Superseding Indictment (hereafter, the "S-2 Indictment") pursuant to Federal Rule of Criminal Procedure (hereafter, "Rule") 12(b)(3)(v); (2) dismissal of Counts Six and Ten of the S-2 Indictment because 18 U.S.C. § 1028A is either unconstitutionally vague on its face, or, alternatively, unconstitutionally vague as-applied to his case; (3) dismissal of Count Ten of the S-2 Indictment on grounds of multiplicity; (4) dismissal of the theft of public money charge (Count Nineteen) of the S-2 Indictment on grounds of duplicity; (5) an order compelling the Government to provide a bill of particulars pursuant to Rule 7(f); (6) an order compelling the Government to provide alleged Brady/Giglio material; (7) the striking of allegedly prejudicial and irrelevant surplusage from the S-2 Indictment pursuant to Rule 7(d); (8) an order compelling the Government to preserve the rough notes and other evidence taken by law enforcement agents during their interviews with all witnesses; and (9) permission for the defense to supplement Defendant's various motions to dismiss if the circumstances require. (See Omnibus Motion, in toto.) For the reasons that follow, Defendant's Omnibus Motion is DENIED IN ITS ENTIRETY.

BACKGROUND[1]

I.   Relevant Individuals and Entities

A. The Defendant

Defendant "was a resident of Queens and Suffolk Counties", who, "[d]uring the 2020 and 2022 election cycles" successfully "campaigned as a candidate for the United States House of Representatives" (hereafter, the "House").  (S-2 Indictment ¶ 1, ECF No. 79.)  "On or about November 8, 2022, [Defendant] was elected the United States Representative for New York's Third Congressional District, which covered parts of Queens and Nassau Counties in the Eastern District of New York."  (Id.)  Defendant "was sworn into office on or about January 7, 2023."  (Id.)

B. The Committee

At some point, Devolder-Santos for Congress (hereafter, the "Committee") was created.  This committee "was the [D]efendant['s] . . . principal congressional campaign committee."  (Id. ¶ 2.)  "Nancy Marks was the treasurer of the Committee."  (Id. ¶ 3.)  "Marks provided additional services to the Committee through a political consulting company that she operated and which was located in Suffolk County, New York."  (Id.)

---

[1] The facts set forth herein are taken from the S-2 Indictment; the Court must assume the S-2 Indictment's allegations are true for purposes of Defendant's Omnibus Motion.  See United States v. Raniere, 384 F. Supp. 3d 282, 292 n.1 (E.D.N.Y. 2019) (citing United States v. Wey, No. 15-CR-0611, 2017 WL 237651, at *5 (S.D.N.Y. Jan. 18, 2017)).

C. National Party Committee #1

"National Party Committee #1 . . . was a national party committee headquartered in Washington D.C." which "managed a program" (hereafter, the "Program") "pursuant to which [it] provided financial and logistical support for [qualifying] congressional candidates." (Id. ¶ 4.) "The Program had three phases, each with its own qualifying criteria." (Id.) For example, "to qualify for the second phase of the Program, congressional candidates were required, among other things, to demonstrate that their campaign committee had raised at least $250,000 from third-party contributors in a single quarter." (Id.)

D. Company #1

Company #1 was "a Florida LLC formed on or about November 1, 2021, with its principal place of business in Merritt Island, Florida." (Id. ¶ 6.)

E. The Devolder Organization LLC

The Devolder Organization LLC (hereafter, the "Devolder Organization") "was a Florida Limited Liability Company . . . formed on or about May 11, 2021, with its principal place of business in Melbourne, Florida." (Id. ¶ 5.) Defendant "was the sole beneficial owner of the Devolder Organization". (Id.) The Devolder Organization was one of two "authorized managers" of Company #1. (Id. ¶ 6.)

4

F. Person #1

Person #1 "was a political consultant operating in Queens County and surrounding areas, including areas within the Eastern District of New York." (Id. ¶ 7.) "In or about and between September 2022 and October 2022, at the direction of [D]efendant . . . Person #1 acted on behalf of Company #1." (Id.)

G. Investment Firm #1

"Investment Firm #1 . . . was a Nevada corporation with its principal place of business in Melbourne, Florida." (Id. ¶ 8.) "Investment Firm #1 was purportedly engaged in retail sales of securities products." (Id.) "In or about and between January 2020 and March 31, 2021, the [D]efendant . . . was employed by Investment Firm #1 as a Regional Director." (Id.) In his capacity as Regional Director, Defendant "received an annual salary of approximately $120,000, which was deposited into a personal bank account maintained by" Defendant (hereafter, "Santos Bank Account #1") "in regular intervals beginning on or about February 3, 2020, and continuing through on or about April 15, 2021." (Id.)

II.   The Alleged Campaign-Related Fraudulent Schemes

According to the S-2 Indictment, "[d]uring the 2022 election cycle," Defendant "devised and executed at least three fraudulent schemes to obtain money for himself and for the Committee by making various material misrepresentations and omissions to, among others," the Federal Election Committee

(hereafter, the "FEC"), "National Party Committee #1, potential contributors to the Committee[,] and the public." (Id. ¶ 15.)

"First, in or about and between December 2021 and November 2022" Defendant, together with Marks, "devised and executed a scheme to submit materially false reports to the FEC on behalf of the Committee in which they fraudulently inflated the Committee's fundraising numbers for the purpose of misleading the FEC, National Party Committee #1 and the public." (Id. ¶ 16.) Defendant's purpose for doing so was to "qualify . . . for different phases of the Program and thereby receive financial and logistical support from National Party Committee #1" (hereafter, the "Party Program Scheme"). (Id.) "As part of the Party Program Scheme," Defendant, together with Marks, "agreed to falsely report to the FEC that family members of [Defendant] and Marks" had contributed significant sums "to the Committee" when, actually, both Defendant and Marks knew "these individuals had not made the reported contributions." (Id.) Additionally, Defendant and Marks "agreed to falsely report to the FEC that [Defendant] had loaned the Committee significant sums of money, when", in fact, Defendant neither "made the reported loans" nor had the funds necessary to do so. (Id.)

Second, the S-2 Indictment alleges, "in or about and between December 2021 and August 2022" Defendant "devised and executed a fraudulent scheme whereby he stole personal identity

and financial information of individuals who had contributed to the Committee and used it to cause these individuals' credit cards to be charged repeatedly without authorization" (hereafter, the "Credit Card Fraud Scheme"). (Id. ¶ 17.) "Through these unauthorized transactions, [Defendant], transferred funds to the Committee, to the campaigns of other candidates for elected office[,] and to his personal bank account." (Id.) Further, to conceal the true source of these funds and to circumvent campaign contribution limits, Defendant "falsely represented that the political contributions were made by other individuals" including Defendant's "relatives and associates." (Id.)

Finally, "in or about and between September and October 2022" Defendant "devised and executed a scheme to defraud and to obtain money from supporters of his candidacy for the House by fraudulently inducing them to contribute funds to Company #1 under the false pretense that the money would be used to support [his] candidacy." (Id. ¶ 18.) Actually, Defendant "spent thousands of dollars of the solicited funds on personal expenses, including luxury designer clothing and credit card payments" (hereafter, the "Company #1 Fraud Scheme"). (Id.) Additionally, Defendant, "personally and through Person #1[,] communicated false information about Company #1 to those supporters." (Id.) This false information included: "that Company #1 was a Section 501(c)(4) social welfare organization or an independent

7

expenditure-only committee" and, consequently, "that contributions made to [it] would be used on independent expenditures in support of [Defendant's] candidacy during the 2022 election cycle." (Id.) Notwithstanding these representations, "Company #1 was neither a Section 501(c)(4) social welfare organization nor an independent expenditure-only committee, and upon receipt of contributions by those supporters to Company #1, [Defendant] converted much of those funds to his own personal benefit." (Id.)

The Court expounds upon the alleged allegations particular to each Campaign-Related Fraudulent Scheme below.

A. The Party Program Scheme

The S-2 Indictment alleges, "[t]hroughout 2021," Defendant, together with Marks, "sought for the Committee to report fundraising totals sufficient to meet the $250,000 threshold necessary to qualify for the second phase of the Program." (Id. ¶ 19.) The Committee failed to qualify for the Program for the third quarter of 2021, due, in part, to its failure to meet this contributions criterion. (Id. ¶ 20.)

"On or about October 12, 2021," Defendant "sent a text message to agents of the Committee, including . . . Marks, asking an agent to 'check in with' an employee of National Party Committee #1 to determine why the Committee failed to qualify for the Program." (Id. ¶ 21.) Responding to Defendant, an agent of the Committee stated, "'the only driver that matters is raising $250K

8

(not loans or candidate contributions) in a single quarter,' and '[i]t's really that simple though . . . $250k raised from donors within a quarter.  We haven't done that yet and that should be our focus.'"  (Id. ¶ 21.)  Defendant replied, "[w]e are going to do this a little different.  I got it."  (Id.)

### 1. Fraudulent Year-End Report

"In or about and between December 2021 and January 2022," Defendant, together with Marks, "conspired and agreed to falsely inflate the Committee's fundraising totals, including, but not limited to, in public filings with the FEC, in order to mislead the FEC, National Party Committee #1[,] and the public."  (Id. ¶ 22.)  In furtherance of the Party Program Scheme, "on or about December 18, 2021," Defendant texted Marks the names of family members of his and Marks, together "with purported contribution amounts for each corresponding family member, for Marks to enter into the Year-End 2021 Report to the FEC."  (Id. ¶¶ 23-24.)  These contributions had the effect of "ensuring that the Committee appeared to reach the $250,000 threshold necessary to qualify for the second phase of the Program."  (Id. ¶ 23.)  Notwithstanding these representations, neither Defendant's family members, nor Marks' family members ever made their listed contribution.  (Id.)

On December 21, 2021, after Marks "texted the Defendant", Santos supplemented his text message to Marks relaying the names of family members and purported contribution amounts

with "addresses and occupations for his relatives", which information, the S-2 Indictment alleges, Defendant "knew would be required for the Year-End 2021 Report to the FEC."  (Id. ¶ 25.) On the "same day, Marks emailed herself the content of [Santos'] text message."  (Id.)

According to the S-2 Indictment, "[i]n or about January 2022," Defendant "repeatedly texted . . . Marks about ensuring that the Committee reached the $250,000 threshold necessary to qualify for the second phase of the Program."  (Id. ¶ 26.) Defendant "advised Marks that he 'really would like to know the final numbers for the quarter.'"  (Id.)  "On or about January 31, 2022, the Committee submitted the Year-End 2021 Report to the FEC"; in so doing, Marks certified she "examined [the] Report and to the best of [her] knowledge and belief it [was] true, correct and complete."  (Id. ¶ 27.)  As per the Year-End 2021 Report to the FEC, the following contribution amounts were allegedly falsely reported:

| Contributor # | Amount Reported | Date |
|---|---|---|
| 1 | $5,800 | 12/31/21 |
| 2 | $2,900 | 12/31/21 |
| 3 | $5,800 | 12/31/21 |
| 4 | $2,900 | 12/31/21 |
| 5 | $5,800 | 12/16/21 |
| 6 | $5,800 | 11/15/21 |
| 7 | $5,800 | 12/31/21 |
| 8 | $5,800 | 12/31/21 |
| 9 | $5,800 | 11/3/21 |
| 10 | $3,900 | 10/9/21 |

(Id.)   These purportedly false contributions, which totaled $53,200, caused "the Committee to falsely claim total quarterly receipts of $251,549.68."   (Id. ¶ 28.)

"Following the submission of the fraudulent Year-End 2021 Report to the FEC, on or about February 10, 2022," Defendant "signed an application for the Program and caused it to be submitted to National Party Committee #1."   (Id. ¶ 29.)   "Based, in part, on its belief that the Committee had exceeded the $250,000 quarterly fundraising benchmark as reported in the Year-End 2021 Report to the FEC, National Party Committee #1 announced [Defendant] as a candidate in the second phase of the Program on or about February 25, 2022."   (Id. ¶ 31.)

## 2. The April 2022 Quarterly Report

Next, the S-2 Indictment alleges, "[i]n or about and between March and April 2022," Defendant, together with Marks, "continued their efforts to falsely inflate the Committee's fundraising totals, including, but not limited to, in public filings with the FEC, in order to mislead the FEC, National Party Committee #1, and the public" so Defendant "would qualify for all phases of the Program" and, in so doing "receive financial and logistical support from National Party Committee #1."   (Id. ¶ 32.) To that end, Defendant and Marks allegedly "agreed to falsely represent in presentations and communications with National Party Committee #1 and in a quarterly submission to the FEC" that

Defendant "had loaned the Committee $500,000" when he had not. (Id.)

In March, Defendant continued to express his concern to associates about "the importance of the Committee reporting substantial fundraising totals for the purpose of ensuring he qualified for the Program and would receive the expected financial support from National Party Committee #1." (Id. ¶¶ 33-34.) Subsequently, "[o]n or about March 21, 2022," Defendant "caused agents of the Committee to deliver a 'Path to Victory' presentation to National Party Committee #1, which falsely represented to National Party Committee #1 staff members" that Defendant "was loaning the Committee $500,000 during the first quarter of 2022." (Id. ¶ 35.) Defendant represented to agents of the Committee "that he was, in fact, making the purported $500,000 loan to the Committee." (Id. ¶ 36.) Notwithstanding his representations, Defendant "did not have the funds to cover such a loan" and, in fact, "had less than $8,000 in his personal and business bank accounts." (Id.)

"On or about April 13, 2022, the Committee further publicized inaccurate fundraising totals for the Committee for the first quarter of 2022, relying on the false representation by" Defendant "that he had loaned the Committee $500,000." (Id. ¶ 37.) Indeed, "the Committee issued a press release in which it stated that [it] would 'report roughly $800,000 raised in Q1, a

12

significant sum in what is likely to be one of the most expensive races in the Country.'" (Id.)  The Committee's statement of its fundraising totals "included the non-existent $500,000 loan purportedly made by" Defendant.  (Id.)

"On or about April 15, 2022, the Committee submitted the April 2022 Quarterly Report to the FEC"; in so doing, Marks certified she had "examined th[e] Report and to the best of [her] knowledge and belief it [was] true, correct and complete." (Id. ¶ 38.)  The April 2022 Quarterly Report is alleged to have "falsely reported that [Defendant] had loaned the Committee $500,000 on March 31, 2022." (Id.)  The S-2 Indictment alleges Defendant and Marks included the allegedly false contribution in this Report "for the purpose of making the Committee appear more financially sound than it was, knowing that the FEC, National Party Committee #1 and the public would rely on the truth and accuracy of these reports." (Id.)

      3. <u>National Party #1 Provides Financial Support to the Committee</u>

The S-2 Indictment alleges, based in part upon Defendant's and Marks' misrepresentations as to "the financial position of the Committee in its reports to the FEC, presentations to National Party Committee #1 and public statements, National Party Committee #1 announced" Defendant "had qualified for the third and final phase of the Program on or about June 14, 2022."

(Id. ¶ 39.)   Thereafter, National Party Committee #1 "provided financial and logistical support to the Committee."   (Id. ¶ 40.) Additionally, Defendant's qualification for the third and final phase of the Program entitled him "to participate in joint fundraising committees with other qualified members of the Program."   (Id. ¶ 42.)

> B. The Credit Card Fraud Scheme

As to the Credit Card Fraud Scheme, the S-2 Indictment alleges Defendant "obtained the personal identity and financial information of individuals who had contributed to the Committee and then caused their access devices to be charged repeatedly without authorization for [Defendant's] direct and indirect benefit, oftentimes concealing the true source of the funds by misappropriating the personal identity information of" his "relatives and associates" without authorization.   (Id. ¶ 43.)

The S-2 Indictment elaborates, "on or about December 14, 2021, Contributor #12" texted Defendant "and another agent of the Committee, providing billing information for two credit cards belonging to Contributor #12 for the purpose of authorizing a contribution to the Committee."   (Id. ¶ 44.)   Subsequently, two contributions of $5,800 and $5,000 "were made to the Committee or affiliated political committees using the credit card billing information provided by Contributor #12."   (Id.) On the same day, Defendant allegedly "caused a third contribution" (hereafter, the

"Fraudulent Contribution") of $5,000, "to be made to the Committee or affiliated political committees using the credit card billing information provided by Contributor #12."  (Id.)

The total amount of contributions charged to the credit cards of Contributor #12 equaled approximately $15,800; "[t]his total exceeded the limits set by the Election Act for the 2022 election cycle."  (Id. ¶ 45.)  Further, the S-2 Indictment alleges "Contributor #12 did not know of or authorize charges exceeding such limits."  (Id.)  "For the purpose of masking the true source of some of these funds and thereby circumventing the Election Act's limits on the amount and sources of money that could be contributed to a federal candidate for elected office," Defendant "falsely identified the source of the funds for the Fraudulent Contribution to be" one of Defendant's relatives, identified as "Person #2." (Id.)  Person #2 was falsely identified "as the source of the funds" for two contributions, one of $2,400, and another of $2,600, in the Year-End 2021 Report submitted to the FEC on or about January 31, 2022.  (Id.)

In the subsequent months, with neither the knowledge of Contributor #12 nor authorization from same, Defendant "repeatedly used the credit card billing information of Contributor #12 in attempts to make at least $44,800 in unauthorized charges."  (Id. ¶ 46.)  Indeed, the S-2 Indictment alleges Defendant "attempted to use the credit card billing information of Contributor #12 to make

15

contributions to the Committee and to the campaign committees of other candidates for elected office in the names of," inter alia: "(a) [Defendant] himself; (b) Person #2; (c) Person #3 . . . and (d) Person #4." (Id.)  Moreover, "[o]n at least one occasion," Defendant allegedly "used the credit card billing information for Contributor #12 to transfer more than $11,000 to" Defendant's "personal bank account"; such transfer was made with neither the knowledge nor authorization of Contributor #12. (Id. ¶ 47.)  Next, "[o]n or about August 1, 2022," Defendant allegedly "used the credit card billing information for Contributor #12 to cause a charge of $12,000, using the credit card processing account of Company #1. Of that sum, approximately $11,651.70 was transferred to the bank account of Company #1." (Id.)  The "same day, approximately $11,580 was then transferred from the bank account of Company #1 to" Defendant's personal bank account. (Id.)

The S-2 Indictment further alleges Defendant "used the credit card billing information of other individuals" besides Contributor #12 "to contribute to the Committee and to the campaigns of other candidates for elected office, all without the knowledge or authorization of th[ose] individual cardholders." (Id. ¶ 48.)  Similarly, "to mask the true source of the funds and to circumvent the Election Act's limits on individual contributions," Defendant masked "those fraudulent transactions by using the names of other unwitting individuals, including

16

individuals who had previously contributed to his campaign and his own relatives, among others."  (Id.)

    C. The Company #1 Fraud Scheme

        As to the Company #1 Fraud Scheme, according to the S-2 Indictment, Defendant "directed Person #1 to solicit contributions to Company #1 from prospective contributors via emails, text messages and telephone calls."  (Id. ¶ 49.)  "In furtherance of th[ese] efforts," Defendant "arranged for the creation of an email address associated with Company #1 for Person #1, provided Person #1 with the names and contact information of prospective contributors and conveyed false information to Person #1 about the nature of Company #1 and the purpose of the contributions."  (Id.) The S-2 Indictment alleges Defendant did so "knowing that Person #1 would then communicate the false information to prospective contributors."  (Id.)  Indeed, at Defendant's direction, Person #1 is alleged to have "falsely advised prospective contributors, inter alia, that Company #1 was a Section 501(c)(4) social welfare organization or an independent expenditure-only committee and therefore not subject to contribution limits, and [further] that contributions to Company #1 would be spent on television advertisements and other independent expenditures benefitting" Defendant's "candidacy for the House."  (Id. ¶ 50.)  Additionally, and again, at Defendant's direction, "Person #1 also provided prospective contributors with instructions for wiring funds to a

bank account maintained by Company #1." (Id.) Defendant was an authorized signatory of this account (hereafter, "Company #1 Bank Account"). (Id.)

According to the S-2 Indictment, Defendant also "sent to prospective contributors one or more text messages in which he requested" they "speak with representatives of Company #1, indicated that he needed contributions to Company #1 and falsely represented that such contributions would be spent on television advertisements independently purchased by Company #1" in support of Defendant's House candidacy. (Id. ¶ 51.) "After receiving emails and text messages from" Defendant and Person #1, "and in reliance upon the materially false statements therein, one or more individuals made contributions to Company #1 in sums exceeding the limits pertaining to candidate committees." (Id. ¶ 52.)

Next, "[o]n or about September 12, 2022," Defendant allegedly "falsely advised Person #1 via text message that Company #1 was 'a small C4' that existed 'just to help this race' and that there were 'no limits' with respect to contributions." (Id. ¶ 53.) The S-2 Indictment alleges Defendant "knew that Company #1 was not, in fact, registered with the Internal Revenue Service as a Section 501(c)(4) social welfare organization." (Id.)

"On or about October 4, 2022, Person #1, acting at the direction of" Defendant "and on behalf of Company #1, sent an email to Contributor #13." (Id. ¶ 54.) In the email, Person #1 "falsely

stated, _inter alia_, that Company #1 was attempting to" raise $700,000 to "compete with the money 'independently' raised" for Defendant's Opponent.  (Id.)  "Thereafter, on or about October 20, 2022, Person #1, again acting at" Defendant's direction "and on behalf of Company #1, sent to Contributor #13 another email, which falsely stated that a contribution from Contributor #13 would be spent, at least in part" on TV advertisement.  (Id.)  A subsequent text message from Person #1, sent at Defendant's direction, was sent to Contributor #13 on October 25, 2022, in which Person #1 "falsely stated that a contribution from Contributor #13 would be spent, at least in part, 'to purchase ads supporting George Santos.'"  (Id.)  "On or about October 26, 2022, in reliance upon these emails and [the] text message, Contributor #13 caused the sum of $25,000 to be wired to Company #1."  (Id.)

The S-2 Indictment next alleges, "on or about October 12, 2022, Person #1," acting at Defendant's direction, "sent an email to Contributor #14," which falsely stated, _inter alia_, "that Company #1 was formed 'exclusively' to aid in electing" Defendant, and, further "[t]here [were] no limits for contributors" since Company #1 was a Section 501(c)(4) independent expenditure committee.  (Id. ¶ 55.)  The email "further stated that all funds raised by Company #1 would be spent 'directly on supporting [Defendant] and his election'"; an email attachment, previously approved by Defendant was included with the email which described

Company #1 as having been formed with the sole purpose of supporting Defendant's candidacy. (Id.) Subsequently, Defendant "sent to Contributor #14 one or more text messages in which" he "reiterated the need for contributions to Company #1, which he falsely stated would be spent 'on TV' advertisements." (Id.) "[I]n reliance upon the email and accompanying text messages, Contributor #14 caused the sum of $25,000 to be wired to Company #1." (Id.) The S-2 Indictment alleges, contrary to his representations, Defendant "knew that Company #1 was not, in fact, registered with the FEC as an independent expenditure-only committee or Super PAC." (Id.)

According to the S-2 Indictment, "[s]hortly after the contributions from Contributor #13 and Contributor #14 were received by Company #1 in the Company #1 Bank Account, they were transferred into bank accounts controlled by" Defendant, "including Devolder Santos Bank Account #1 and a second personal bank account maintained" by Defendant (hereafter, "Devolder Santos Bank Account #2"). (Id. ¶ 56.) Subsequently, Defendant spent these funds "for his personal benefit, including to make cash withdrawals, personal purchases of luxury designer clothing, credit card payments, a car payment, payments on personal debts and one or more bank transfers to [Defendant's] personal associates." (Id.)

20

D. <u>The Employment-Related Fraudulent Schemes</u>[2]

1. <u>Application for and Receipt of Unemployment Benefits</u>[3]

As to Defendant's alleged application for and receipt of unemployment insurance benefits, the S-2 Indictment alleges, "[o]n or about June 17, 2020," Defendant "applied to receive unemployment insurance benefits through the New York State Department of Labor" (hereafter, the "NYS DOL"). (<u>Id.</u> ¶ 58.)  As part of his application, Defendant "falsely claimed to have been unemployed since the week of March 22, 2020." (<u>Id.</u>)  Thereafter, "[b]eginning

---

[2] While the Omnibus Motion does not implicate the facts pertinent to Defendant's alleged Employment-Related Fraud Schemes, for the sake of completeness, the Court includes the allegations specific to these schemes herein.

[3] As alleged in the S-2 Indictment:

> On or about March 27, 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was enacted.  In light of the ongoing health crisis related to the novel coronavirus, COVID-19, the CARES Act allocated additional unemployment benefits for eligible individuals.  Specifically, the CARES Act established additional unemployment insurance programs, including the Pandemic Unemployment Assistance program and the Federal Pandemic Unemployment Compensation program.  Both programs were federally funded and were administered by states, including New York State.

(S-2 Indictment ¶ 57.)  The S-2 Indictment alleges, "[f]unds from both programs, as well as from the Federal Emergency Management Agency's Lost Wages Assistance Program, comprised the benefits fraudulently obtained" by Defendant in connection with this alleged scheme. (<u>Id.</u>)

on or about June 19, 2020, and continuing through on or about April 15, 2021," Defendant "certified his continuing eligibility for unemployment benefits on a weekly basis, in each case falsely attesting, <u>inter alia</u>, that he was unemployed, available to take on new work and eligible for benefits." (<u>Id.</u>) According to the S-2 Indictment, however, "beginning on or about February 3, 2020, and continuing through on or about April 15, 2021," Defendant "was a Regional Director at Investment Firm #1." (<u>Id.</u>) "During that period, with the exception of approximately July 5, 2020, through August 30, 2020, [Defendant] received regular deposits into his personal bank accounts as part of his Regional Director salary of approximately $120,000 per year." (<u>Id.</u>)

In sum, "[f]or the period of approximately March 22, 2020, through April 15, 2021, based on a false application and false weekly certifications to the NYS DOL" Defendant "received approximately $24,744 in unemployment insurance benefits" which were deposited into Devolder Santos Bank Account #2. (<u>Id.</u> ¶ 59.)

## 2. <u>False Statements in House Disclosure Reports</u>

The S-2 Indictment highlights, "[p]ursuant to the Ethics in Government Act of 1978, as a candidate for the House in 2020 and 2022," Defendant owed a duty "to file a Financial Disclosure Statement" (hereafter, the "House Disclosures") "at designated times prior to each of the general elections held on November 3, 2020, and November 8, 2022, respectively." (<u>Id.</u> ¶ 60.) Proper

completion of the House Disclosures required Defendant to "make a 'full and complete statement'" of, <u>inter alia</u>:

> (a) his assets and income, transactions, liabilities, positions held and arrangements and agreements; (b) "the source, type, and amount or value of income . . . from any source (other than from current employment by the United States Government)"; and (c) "the source, date, and amounts of honoraria from any source, received" for "the year of filing and the preceding calendar year."

(<u>Id.</u>)    Additionally, "[a]s a candidate[,] [Defendant] was personally required to certify the House Disclosures were 'true, complete, and correct to the best of [his] knowledge and belief.'" (<u>Id.</u>)

Defendant "was required to make the[] House Disclosures via an online filing system maintained by the House Committee on Ethics or pre-printed form, and to certify that the statements made therein were true, complete and correct."    (<u>Id.</u> ¶ 61.) Defendant "was required to file the House Disclosures with the Clerk of the House, for transmission to the House Committee on Ethics." (<u>Id.</u>)

According to the S-2 Indictment, "[o]n or about May 11, 2020, in connection with the 2020 election for the House," Defendant "filed two House Disclosures" (hereafter, the "2020 House Disclosures") where:

> [H]e falsely certified that, during the reporting period: (a) his only earned income consisted of salary, commission and bonuses

23

> totaling $55,000 from Company #2[;] . . . and
> (b) the only compensation exceeding $5,000 he
> received from a single source in which he had
> an ownership interest was an unspecified
> commission bonus from Company #2.

(Id. ¶ 62.)  Notwithstanding Defendant's attestations, Defendant

was allegedly aware that "from approximately February 1, 2020,

through the date upon which he filed the 2020 House Disclosures,"

he had "received approximately $25,403 in income from Investment

Firm #1, which he failed to truthfully report as required."  (Id.

¶ 63.)  Furthermore, Defendant allegedly "knew that he had received

only $27,555 in compensation from Company #2 in 2019."  (Id.)

        "Thereafter, on or about September 6, 2022, in

connection with the 2022 election for the House," Defendant "filed

a House Disclosure" (hereafter, the "2022 House Disclosure"),

where he:

> [F]alsely certified that, during the reporting
> period: (a) his earned income consisted of
> $750,000 in salary from the Devolder
> Organization LLC; (b) his unearned income
> included dividends from the Devolder
> Organization LLC valued at between $1,000,001
> and $5,000,000; (c) he had no compensation
> exceeding $5,000 from a single source in which
> he had an ownership interest; (d) he owned a
> checking account with deposits totaling
> between $100,001 and $250,000; and (e) he
> owned a savings account with deposits totaling
> between $1,000,001 and $5,000,000.

(Id. ¶ 64.)  Contrary to his assertions, Defendant allegedly knew

that "during the applicable reporting period, he had not received

from the Devolder Organization LLC the reported amounts of salary

or dividends and, during the reporting period, he did not maintain checking or savings accounts with deposits in the reported amounts." (Id. ¶ 65.)  Furthermore, "from approximately January 2021 through September 2021, [Defendant] received approximately $28,107 in income from Investment Firm #1 and approximately $20,304 in unemployment insurance benefits from the NYS DOL" neither of which was truthfully reported as was required.  (Id.)

## PROCEDURAL HISTORY

In view of the foregoing allegations, Defendant is charged by a twenty-three count Second Superseding Indictment, dated May 28, 2024.  (See generally S-2 Indictment.)[4]  These counts, outlined with reference to the alleged "scheme" to which they pertain, are as follows:

| Party Program Scheme | |
|---|---|
| COUNT 1: Conspiracy (18 U.S.C. § 371) | |
| 2021 Year End Report | Count 2: Wire Fraud (18 U.S.C. § 1343) COUNT 4: False Statements (18 U.S.C. § 1001(a)(2)) COUNT 5: Falsification of a Document |

---

[4] Defendant was arraigned on the initial indictment on May 10, 2023, and entered a plea of not guilty.  (See ECF No. 9.)  On October 27, 2023, Defendant was arraigned on the first superseding indictment (hereafter, the "S-1 Indictment") and, likewise, entered a plea of not guilty.  (See ECF No. 53.)  Defendant is scheduled to be arraigned on the S-2 Indictment on August 13, 2024. (See June 11, 2024 Elec. Order.)

| Party Program Scheme | |
|---|---|
| | (18 U.S.C. § 1519) |
| | **COUNT 6:** Aggravated Identity Theft |
| | (18 U.S.C. § 1028A(a)(1)) |
| April 22 Quarterly Report | **COUNT 3:** Wire Fraud |
| | (18 U.S.C. § 1343) |
| | **COUNT 7:** False Statements |
| | (18 U.S.C. § 1001(a)(2)) |
| | **COUNT 8:** Falsification of a Document |
| | (18 U.S.C. § 1519) |
| Credit Card Fraud Scheme | |
| **COUNT 9:** Access Device Fraud (18 U.S.C. § 1343) | |
| **COUNT 10:** Aggravated Identify Theft (18 U.S.C. § 1028A(a)(1)) | |
| Company #1 Fraud Scheme | |
| Contributor #13 | **COUNT 11:** Wire Fraud |
| | (18 U.S.C. § 1343): October 4, 2022 Email |
| | **COUNT 13:** Wire Fraud |
| | (18 U.S.C. § 1343): October 20, 2022 Email |
| | **COUNT 15:** Wire Fraud |
| | (18 U.S.C. § 1343): October 25, 2022 Text Message |
| | **COUNT 17:** Unlawful Money Transactions over $10,000 |
| | (18 U.S.C. § 1957(a)): October 26, 2022, transfer of approximately $25,000 |
| | **COUNT 18:** Unlawful Money Transactions over $10,000 |
| | (18 U.S.C. § 1957(a)): October 26, 2022, transfer of approximately $24,000 |

| Contributor #14 | **COUNT 12:** Wire Fraud |
| | (18 U.S.C. § 1343): October 12, 2022 Email |
| | **COUNT 14:** Wire Fraud |
| | (18 U.S.C. § 1343): October 21, 2022 Text Message |
| | **COUNT 16:** Unlawful Money Transactions over $10,000 |
| | (18 U.S.C. § 1957(a)): October 21, 2022 transfer of approximately $25,000 |
| **Employment-Related Fraudulent Scheme** | |
| **COUNT 19:** Theft of Public Money (18 U.S.C. § 641) | |
| **COUNT 20:** Wire Fraud<br><br>(18 U.S.C. § 1343): January 19, 2021, Receipt of $564.00 by Defendant from the NYS DOL. | |
| **COUNT 21:** Wire Fraud<br><br>(18 U.S.C. § 1343): January 26, 2021, Receipt of $564.00 by Defendant from the NYS DOL | |
| **House Disclosure Report Scheme** | |
| May 11, 2020 House Disclosure Report and Amended House Disclosure Report | **COUNT 22:** False Statements<br><br>(18 U.S.C. § 1001(a)(2)) |
| September 6, 2022 House Disclosure Report | **COUNT 23:** False Statements<br><br>(18 U.S.C. § 1001(a)(2)) |

(See S-2 Indictment ¶¶ 66-99.)

On May 3, 2024, Defendant filed the present Omnibus Motion seeking: (1) dismissal of Counts Six and Ten pursuant to the Supreme Court's decision in Dubin v. United States, 599 U.S. 110 (2023); or, alternatively, dismissal of these counts on the basis that § 1028(A) is unconstitutionally vague both on its face,

and as applied to the allegations in this case; (2) dismissal of Count Ten as multiplicitous of Count Nine; (3) dismissal of Count Nineteen as duplicitous; (4) an order compelling the Government to provide a Bill of Particulars; (5) an order compelling production and disclosure, from the Government, of alleged Brady/Giglio material; (6) an order from this Court striking "prejudicial surplusage" from the S-2 Indictment; and (7) an order compelling the Government to preserve rough notes and other evidence taken by law enforcement agents during their interviews with all witnesses. (See Support Memo, ECF No. 74-1, in toto.)

On May 31, 2024, the Government filed its Opposition to Defendant's Omnibus Motion.  (See ECF No. 80.)  On May 28, 2024, after Defendant filed his Omnibus Motion, but prior to the Government's filing of its Opposition, the Government filed the S-2 Indictment against Defendant.[5]  Subsequently, Defendant sought an extension of time to file his Reply; this request was granted in part and denied in part (see June 6, 2024 Elec. Order).  On June 14, 2024, Defendant filed his Reply (see ECF No. 88).

---

[5] After filing the S-2 Indictment, the Government confirmed by letter that it consented to the Court construing the Defendant's motion to dismiss the S-1 Indictment as applying to the S-2 Indictment (see Letter, ECF No. 78).  Defendant did not object to the Court construing his dismissal requests in that way but sought additional time to file his Reply.  (See Extension Request, ECF No. 82, in toto.)

DISCUSSION

I.   Legal Standard[6]

"Rule 12 authorizes defendants to challenge the lawfulness of a prosecution on purely legal, as opposed to factual, grounds." United States v. Benitez-Dominguez, 440 F. Supp. 3d 202, 205 (E.D.N.Y. 2020) (quoting United States v. Ahmed, 94 F. Supp. 3d 394, 404 (E.D.N.Y. 2015)).  "A defendant faces a high standard in seeking to dismiss an indictment, because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged." United States v. Taveras, 504 F. Supp. 3d 272, 277 (S.D.N.Y. 2020) (quoting United States v. Smith, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014)).  "On a Rule 12(b) motion to dismiss an indictment, 'the Court accepts the allegations in the indictment as true and may not consider the sufficiency of the evidence.'" United States v. Navarro, 551 F. Supp. 3d 380, 388 (S.D.N.Y. 2021) (quoting United States v. Block, No. 16-CR-0595, 2017 WL 1608905, at *2 (S.D.N.Y. Apr. 28, 2017)).  Indeed, "[t]here is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context."  United States v. Ground, No. 11-CR-151A, 2014 WL 9940092, at *2 (W.D.N.Y. July 29, 2014);

---

[6] Considering the legal standard outlined in this section, Santos' request to supplement his dismissal requests at a later date, "if the facts and circumstances warrant", is denied.

see also United States v. Phillips, 690 F. Supp. 3d 268, 277 (S.D.N.Y. 2023) ("[S]ummary judgment does not exist in federal criminal procedure" (quoting United States v. Aiyer, 33 F.4th 97, 117 (2d Cir. 2022) (alteration in original))).

Consequently, an indictment which (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense", shall withstand a challenge pursuant to Rule 12(b). United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)). "A charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged." Benitez-Dominguez, 440 F. Supp. 3d at 205 (citations omitted); but see United States v. Bankman-Fried, 680 F. Supp. 3d 289, 304 (S.D.N.Y. 2023) ("[T]he Second Circuit has deemed dismissal [of charges] an extreme sanction that has been upheld only in very limited and extreme circumstances, and should be reserved for the truly extreme cases, especially where serious criminal conduct is involved. Ultimately, an indictment need not be perfect, and common sense and reason are more important than technicalities." (internal quotation marks and citations omitted)).

The Second Circuit has outlined "a narrow exception to the rule that a court cannot test the sufficiency of the government's evidence on a Rule 12(b) motion" where "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial". United States v. Sampson, 898 F.3d 270, 282 (2d Cir. 2018) (citing Alfonso, 143 F.3d at 772). "A speaking indictment alone does not satisfy the 'full proffer' requirement"; instead "the government must 'proffer[] all of its evidence.'" Phillips, 690 F. Supp. 3d at 278 (quoting Sampson, 898 F.3d at 283 (emphasis in original)); see e.g., United States v. Mennuti, 639 F.2d 107, 108-09 (2d Cir. 1981) (holding, "an affidavit of an Assistant United States Attorney, . . . stating the facts on which [the government] would rely as showing that defendants' alleged acts were within the statute" could be used by a court to test the sufficiency of the evidence), abrogated in part on other grounds, Russell v. United States, 471 U.S. 858 (1985).

II. Analysis

   A. Motion to Dismiss Counts Six & Ten of the S-2 Indictment for Failure to State a Claim Pursuant to Rule 12(b)(3)(v)

      1. Applicable Legal Standard

"Section 1028A(a)(1) applies when a defendant, 'during and in relation to any [predicate offense], knowingly transfers, possesses, or uses, without lawful authority, a means of

identification of another person.'" Dubin, 599 U.S. at 115 (quoting 18 U.S.C. § 1028A(a)(1) (alteration in original)). Qualified predicate offenses include, inter alia: wire fraud, in violation of 18 U.S.C § 1343; false statements, in violation of 18 U.S.C. § 1001; and access device fraud, in violation of 18 U.S.C. § 1029. See 18 U.S.C. § 1028(A)(c)(4)-(5). For purposes of § 1028A(a)(1), "means of identification" of another person is defined to include "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." 18 U.S.C. § 1028(d)(7); see also United States v. Dumitru, 991 F.3d 427, 432 (2d Cir. 2021) ("A 'means of identification' is defined broadly to include names.").

Interpreting § 1028A(a)(1), the Supreme Court recently clarified, "[a] defendant 'uses' another person's means of identification 'in relation to' a predicate offense when this use is at the crux of what makes the conduct criminal." Dubin, 599 U.S. at 131. "[B]eing at the crux of the criminality requires more than a causal relationship, such as 'facilitation' of the offense or being a but-for cause of its 'success.'" Id. Instead, for predicate offenses involving fraud or deceit, "the means of identification specifically must be used in a manner that is fraudulent or deceptive. Such fraud or deceit going to identity can often be succinctly summarized as going to 'who' is involved." Id. at 132.

2. <u>Count Six of the S-2 Indictment Adequately Alleges
   Aggravated Identity Theft</u>

Count Six of the S-2 Indictment charges Defendant with
aggravated identify theft, in violation of § 1028A(a)(1) (<u>see</u> S-2
Indictment ¶¶ 77, 85.)  Specifically, Count Six alleges, on or
about January 31, 2022, Defendant, together with others:

> [D]uring and in relation to the crimes charged
> in Counts Two [wire fraud, 18 U.S.C. § 1343]
> and Four [false statements, 18 U.S.C.
> § 1001(a)(2)], did knowingly and
> intentionally transfer, possess and use,
> without lawful authority, one or more means of
> identification of a person, to wit: the
> name[s] of Contributor[s] #1 [through #11],
> knowing that the means of identification
> belonged to said other persons.

(<u>Id.</u> ¶ 77.)

Here, Defendant argues "the 'crux' of the fraud
underlying Count Six is [Defendant's] alleged false inflation of
the amount of money raised by his campaign, not the identities of
the individuals that donated."  (Support Memo at 12.)  Defendant
highlights, "<u>who</u> Santos and Marks allegedly used to falsely inflate
the fundraising totals was irrelevant to the overall goal" which,
as alleged in the operative Indictment, was to "report fundraising
totals sufficient to meet the $250,000 threshold necessary to
qualify for the second phase of the Program."  (<u>Id.</u>)  Expounding
upon his argument, Defendant urges this Court to consider recently
disclosed <u>Brady</u> evidence in which ███████████   ██████████
████████████   ██████████████  █  ████████   ████  ███████  █

33



Defendant contends this disclosure emphasizes the inapplicability of § 1028A since the usage of the Contributors' names "was an ancillary feature of what makes the conduct criminal and cannot be said to have played a 'key role' in the fraud described by the government." (Id. at 13.)

The Government counters, as an initial matter, Santos' argument is inappropriate at the pretrial stage of proceedings since he challenges the sufficiency of the Government's evidence, "not . . . the contours of the indictment under Rule 7 or Rule 12". (Opp'n at 18.) The Government emphasizes it has not made a full proffer of its evidence, and that it has "met, and exceeded, its obligations under Rule 7 and is under no obligation to provide Santos with a more fulsome preview of its trial evidence." (Id. at 19.) Addressing Defendant's Dubin-based arguments, the Government contends Defendant's "claims are premised on inaccurate and premature framings of the facts." (Id.) For example, the Government refutes Santos' assertion that the identities of the individual contributors were ancillary to the falsehoods central to the predicate offenses. (Id.) On the contrary, the Government asserts, "Count Six alleges that Santos and Marks conspired to,

and did, use the real names of eleven individuals without those individuals' knowledge or consent by falsely reporting to the FEC that those individuals had made certain non-existent campaign contributions[.]" (Id.) The Government emphasizes these allegations adequately state a violation of § 1028A post-Dubin since they form part of a "fraud or deceit" which goes "to 'who' is involved." (Id.) Further, the Government stresses the fact-based nature of Defendant's arguments, highlighting it expects to introduce trial evidence which will "establish beyond a reasonable doubt that the representation that the[] contributions had been made by real individual contributors was material to the National Party Committee #1", notwithstanding

██████████████████████████████████████████████

██████████████████████████████████████████████

(Id. at 20.)

        First, the Court agrees with the Government that Santos cannot presently challenge the sufficiency of the Government's evidence since, notwithstanding the lengthy nature of the S-2 Indictment's allegations, the Government has not made a full proffer of its evidence. Phillips, 690 F. Supp. 3d at 278 ("The Government, or the grand jury more precisely, is permitted to give a defendant more detail regarding the evidence against him without assuming the risk that a court will treat such detail as a proffer of all of the evidence."). Consequently, Santos may challenge the

S-2 Indictment solely on legal grounds.  See United States v. Watson, No. 23-CR-0082, 2024 WL 1858199, at *5 (E.D.N.Y. Apr. 29, 2024) (denying motion to dismiss aggravated identity theft count in indictment because "sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment" and defendant "ha[d] not shown that anything like a 'full proffer'" of the evidence had been made by the Government).[7]

Undeterred, Defendant contends his Dubin-based arguments remain cognizable before this Court because his challenge goes to "the adequacy of the allegations in the S-2 Indictment."  (Reply at 6.)  Santos elaborates, post-Dubin "the S-2 Indictment's allegations, even if true, are legally insufficient to support a Section 1028A conviction, and there are no supplemental or different facts the government can present at trial to change that."  (Id. at 10 (emphasis in original); see also id. at 11

---

[7] Defendant attempts to distinguish Watson by arguing "the Watson court denied the [defendant's] motion because materiality is a 'mixed question of law and fact that the Second Circuit has repeatedly held is properly reserved for jury determination.'" (Reply at 11-12.)  However, the discussion of materiality in Watson was unrelated to the defendant's motion to dismiss the § 1028A count in that case.  Instead, in denying the Watson defendant's motion to dismiss the aggravated identity theft count, the Watson court found that: (1) the count properly "recite[d] the elements of the offense"; (2) sufficiency of the allegations was not appropriately addressed at the motion to dismiss stage of proceedings; and (3) defendant could not show a full proffer had been made by the Government.  Watson, 2024 WL 1858199, at *5.  So too here.

("Santos' unauthorized use of names on FEC reports for the purpose of inflating contribution totals . . . can <u>never</u> sustain a section 1028A charge post-<u>Dubin</u>, regardless of how many additional facts the government presents at trial" (emphasis in original).) The Court disagrees. Indeed, proof that the usage of the contributors' names was a key mover in the criminality would suffice to satisfy the "crux" requirement elucidated in <u>Dubin</u>. See <u>Dubin</u>, 599 U.S. at 122-23.

Here, <u>United States v. Croft</u> is illustrative. 87 F.4th 644 (5th Cir. 2023), <u>cert. denied</u>, 144 S. Ct. 1130 (2024).[8] In <u>Croft</u> the Fifth Circuit affirmed an appellant's aggravated

---

[8] By contrast, the facts presented in <u>Dubin</u> are markedly different from those of the case at bar and <u>Croft</u>. In <u>Dubin</u>, petitioner submitted a reimbursement claim to Medicaid for psychological testing performed by a licensed psychologist when the psychological testing was actually performed by a more junior "psychological associate". 599 U.S. at 114. "This falsehood inflated the amount of reimbursement." <u>Id.</u> Consequently, petitioner was charged with healthcare fraud under 18 U.S.C. § 1347. <u>Id.</u> Moreover, because petitioner's fraudulent billing used the patient's name and Medicaid number, the Government contended "that § 1028A(1) was automatically satisfied"; so, he was charged with aggravated identity theft pursuant to that section. <u>Id.</u> at 114-15.

In reversing petitioner's aggravated identity theft conviction, the Supreme Court held that the use of the patient's name "was not at the crux of what made the underlying overbilling fraudulent". <u>Id.</u> at 132. Instead, the usage of the patient's name "was an ancillary feature of the billing method employed." <u>Id.</u> That is, the petitioner's fraud in <u>Dubin</u> "was in misrepresenting <u>how</u> and <u>when</u> services were provided to a patient, [and] not <u>who</u> received the services." <u>Id.</u>

identity theft conviction, post-Dubin, under factual circumstances akin to those presented here.[9] Id. The appellant in Croft "owned and operated Universal K-9, a school that primarily trained handlers and dogs for police work." Id. at 646. Appellant sought to expand his business "by offering courses to veterans, who would pay tuition using G.I. Bill funds paid by the Department of Veterans Affairs." Id. Eligibility for these funds required Universal K-9 "to first obtain certification from the Texas Veterans Commission" (the "TVC"), which required Universal K-9 to employ "dog trainers with certain qualifications." Id. In March 2016, the Croft appellant submitted an application to the TVC which represented four instructors, each of whom possessed the requisite qualifications, taught classes at Universal K-9. Id. At trial, witness testimony from these four instructors established "they had never given their permission to be named as instructors for the purposes of the TVC application, nor had they actually served as instructors for the courses listed." Id. Likewise, "the Assistant Director of the TVC during the relevant timeframe, testified that Universal K-9's application would not have been approved without the names of the instructors, their

---

[9] The Court recognizes that while Croft is not binding upon this Court, absent direct authority from the Second Circuit interpreting Dubin, the Court finds the Fifth Circuit's reasoning and analysis in Croft to be persuasive.

qualifications, and information about the classes they would teach."[10]   Id.   Affirming the Croft appellant's conviction, the Fifth Circuit held, "the government met its 'core' or 'crux' burden under Dubin" because the appellant's "application to the TVC was fraudulent" due to "his misappropriation of the victim trainers' means of identification" and "[t]his theft was the 'key mover in [the appellant's] criminality.'"   Id. at 649.

Here, the allegations in the S-2 Indictment resemble the facts in Croft.   For example, the S-2 Indictment alleges Santos and Marks conspired to inflate Defendant's fundraising totals to qualify for the second phase of the Program and receive financial and logistical support from National Party Committee #1.   Only qualified candidates whose fundraising totals exceeded the $250,000 threshold were eligible to receive such support.   To appear to have qualified, Defendant used the real names of eleven "contributors" without their knowledge, or authorization, to falsely report to the FEC that those individuals had contributed to the Committee. (See S-2 Indictment ¶¶ 76-77.)   Defendant's use of the contributors' means of identification, therefore, can be said to have been central, or "a key mover", in the criminality because his misrepresentations about "who" contributed to his

---

[10] Another representative of the TVC testified, "the roster of instructors and their qualifications was 'particularly important' to the application."   Croft, 87 F.4th at 649.

campaign share a strong nexus with the predicate offenses charged. See also United States v. De Los Santos, No. 22-CR-3164, 2024 WL 3041944, at *2 n.3 (2d Cir. June 18, 2024) (stating, regarding § 1028A, "the misuse of another person's means of identification [is] 'at the crux' of the fraud" where "the very nature of the scheme required the use of a person's identification"); United States v. Gladden, 78 F.4th 1232, 1244 (11th Cir. 2023) (explaining, Dubin limited § 1028A's reach "to situations where 'a genuine nexus' exists between the use of a means of identification and the predicate offense"). Without either knowing the full extent of the Government's evidence or testing the sufficiency of evidence of which the Parties have made the Court aware, the Court cannot, as a matter of law, find that the allegations in the S-2 Indictment can never sustain a § 1028A conviction.

### 3. Count Ten of the S-2 Indictment Adequately Alleges Aggravated Identity Theft

In pertinent part, Count Ten of the S-2 Indictment alleges, in or about and between December 2021 and August 2022, Defendant, together with others:

> [D]uring and in relation to the crime charged in Count Nine [access device fraud, 18 U.S.C. § 1029(a)(5)], did knowingly and intentionally transfer, possess and use, without lawful authority, one or more means of identification of one or more persons.

40

(Id. ¶ 85.)[11]

In sum, Defendant characterizes Count Ten as alleging "that contributors to Santos' campaign provided him with their credit card information and authority to charge a contribution, but that in addition to charging the authorized contribution, Santos overcharged these credit cards by making additional unauthorized charges." (Support Memo at 16.)  Defendant contends, "Dubin makes clear, this is precisely the type of overcharging or overbilling that does not constitute aggravated identity theft under Section 1028A."  (Id.)

The Government hastens to correct Defendant's narrow construction of the allegations relevant to Count Ten, emphasizing that the conduct complained of went beyond merely "overcharging." Indeed, the Government asserts, "the [S-2] Indictment makes clear, Santos is alleged to have committed aggravated identity theft in Count Ten in two ways": first, by using "contributors' credit card

---

[11] The Court notes that the quoted language, taken from the S-2 Indictment, differs slightly from what was initially alleged under Count Ten of the S-1 Indictment in that the S-1 Indictment included a "to wit" clause.  (Compare id. ¶ 85, with S-1 Indictment, ECF No. 50, ¶ 85 ("In or about and between December 2021 and August 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant . . . together with others, during and in relation to the crime charged in Count Nine, did knowingly and intentionally transfer, possess and use, without lawful authority, one or more means of identification of one or more persons, to wit: the name and access device of Contributor #12, knowing that the means of identification belonged to another person." (emphasis added)).)

billing information to make unauthorized contributions to political committees, including his own, and to transfer money to his personal bank account, all without the cardholders' knowledge or consent" ; and second, by "'conceal[ing] the true source of the funds by misappropriating the personal identity information' of others." (Opp'n at 20.) Specifically, the Government emphasizes:

> [I]n an effort to mask the true source of the funds and to circumvent the Election Act's limits on individual contributions, [Santos] repeatedly masked those fraudulent transactions by using the names of other unwitting individuals, including individuals who had previously contributed to his campaign and his own relatives, among others.

(Id. at 21.) In so doing, the Government argues Santos was able to "create[] the false impression that different people were making the various charges, thus allowing him to charge the same credit cards multiple times for campaign contributions without appearing to exceed campaign contribution limits." (Id.) The Government asserts these allegations "track[] [the] ordinary understandings of identity theft." (Id.) Moreover, it contends, "Dubin specifically cites as an example of identity theft 'a crime in which someone steals personal information about and belonging to another, such as a bank-account number or a driver's-license number, and uses the information to deceive others.'" (Id.)

Here, the Court finds Count Ten of the S-2 Indictment adequately alleges aggravated identity theft under either of the

42

Government's two theories, since the underpinning of each theory is Defendant's "unlawful taking and use of another person's identifying information" -- either the credit card billing information of non-consenting cardholders, or the names of false contributors -- "for fraudulent purposes." Dubin, 599 U.S. at 122.[12]  Dubin makes clear such situations constitute aggravated identity theft under § 1028A since the focus is centered upon how a defendant used the means of identification to deceive.  See id. at 122-23 ("This understanding of identity theft also supports a more targeted definition of 'uses.' The word 'use' appears in these definitions with a specific meaning: Identity theft encompasses when a defendant 'uses the information to deceive others,' and 'the fraudulent . . . use' of a means of identification[.]  In other words, identity theft is committed when a defendant uses the means of identification itself to defraud or deceive. This tracks the Sixth Circuit's heuristic. When a means of identification is

---

[12] Defendant notes the operative indictment "does not allege that Santos came into possession of any of the contributors' credit card information unlawfully" and, on the contrary, "[a]ll of the credit cards were voluntarily sent to Santos' campaign". (Support Memo at 14.)  In so arguing, Santos contends Count Ten must be dismissed since Dubin "explicitly limited the application of Section 1028A to circumstances in which a defendant has improperly transferred the means of identification." (Id. at 17.)  The Court is neither persuaded by Defendant's argument, nor his framing of the Supreme Court's holding in Dubin.  In fact, and as noted in Dubin, "'[s]teal[ing]' can, of course, include situations where something was initially lawfully acquired." Dubin, 599 U.S. at 122 n.6 (citing BLACK'S LAW DICTIONARY 1710 (11th ed. 2019) (alteration in original)).

used deceptively, this deception goes to 'who' is involved, rather than just 'how' or 'when' services were provided. Use of the means of identification would therefore be at 'the locus of [the criminal] undertaking,' rather than merely 'passive,' 'passing,' or ancillary employment in a crime.'" (emphasis in original) (internal citations omitted)).

     B. <u>Motion to Dismiss Counts Six & Ten of the S-2 Indictment Based Upon Unconstitutional Vagueness</u>

       1. <u>Applicable Legal Standard</u>

The Fifth Amendment provides no person shall "be deprived of life, liberty, or property, without due process of the law." U.S. Const. amend. V. "A statute can be impermissibly vague", and, consequently, violative of the Fifth Amendment's Due Process Clause, "for either of two independent reasons". <u>Hill v. Colorado</u>, 530 U.S. 703, 732 (2000). First, a statute is impermissibly vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." <u>Id.</u> Second, a statute can be impermissibly vague "if its vagueness makes the law unacceptably vulnerable to 'arbitrary enforcement.'" <u>United States v. Demott</u>, 906 F.3d 231, 237 (2d. Cir. 2018) (citing <u>Kolender v. Lawson</u>, 461 U.S. 352, 357-58 (1983)).

2. <u>The    Court    Declines    to    Find    § 1028A</u>
<u>Unconstitutionally Vague on its Face</u>

Alternatively, Santos argues Counts Six and Ten of the
S-2 Indictment must also be dismissed because § 1028A is
unconstitutionally vague on its face.  (Support Memo at 20.)

A statute may be challenged as vague "on its face" where
the statute "is so fatally indefinite that it cannot
constitutionally be applied to anyone."  <u>Copeland v. Vance</u>, 893
F.3d 101, 110 (2d Cir. 2018).  "A facial challenge is 'the most
difficult challenge to mount successfully' because, as a general
matter, 'the challenger must establish that no set of circumstances
exists under which the Act would be valid.'"  <u>Id.</u> (quoting <u>United</u>
<u>States v. Salerno</u>, 481 U.S. 739, 745 (1987)).

Santos cites neither controlling nor persuasive law on
this issue; instead, Defendant simply asserts his agreement with
Justice Gorsuch's concurrence in <u>Dubin</u>.  (<u>See</u> Support Memo at
20-21.)  The Court declines to engage Defendant in a purely
academic discussion. Instead, the Court simply highlights that,
while the issue of unconstitutional vagueness was not before the
Supreme Court in <u>Dubin</u>, Justice Sotomayor, writing for the
majority, addressed Justice Gorsuch's concerns as to whether
§ 1028A was unconstitutionally vague in a manner which this Court
perceives as foreclosing Defendant's current argument.  <u>See</u> <u>Dubin</u>,
599 U.S. at 132 n.10 ("The concurrence's bewilderment is not,

45

fortunately, the standard for striking down an Act of Congress as unconstitutionally vague. There will be close cases, certainly, but that is commonplace in criminal law. . . . [R]esolving hard cases is part of the judicial job description. Hastily resorting to vagueness doctrine, in contrast, would hobble legislatures' ability to draw nuanced lines to address a complex world. Such an approach would also leave victims of actual aggravated identity theft, a serious offense, without the added protection of § 1028A(a)(1).")

"Under [this] guidance," the Court "decline[s] to find that Section 1028A is unconstitutionally vague." Gladden, 78 F.4th at 1247; see also United States v. Demasi, No. 22-CV-20670, 2023 WL 6701998, at *6 (E.D. Mich. Oct. 12, 2023) (same).

> 3. Santos' As-Applied Challenge to § 1028A is Premature

Santos next challenges § 1028A as being unconstitutionally vague as applied to the facts of his case.

A vagueness challenge can also "concern a statute 'as applied' to the challenger, who professes that the law in question 'cannot constitutionally be applied to the challenger's individual circumstances.'" United States v. Requena, 980 F.3d 30, 39 (2d Cir. 2020) (quoting Vance, 893 F.3d at 110).

Santos' as-applied vagueness arguments recycle many of his previously raised points, i.e., that the means of

46

identification used purportedly did not go to the crux of the fraudulent scheme, but was merely ancillary to it, and expounds, as to Count Six, that "[a]n ordinary person would not appreciate that such ancillary use of names, when the purpose was to inflate values alone, constitutes identity theft under Section 1028A." (Support Memo at 22.)  As to Count Ten, Santos avers "[i]t is particularly difficult to determine whether the[] allegations fall within Section 1028A because Santos was provided the credit card information voluntarily by his contributors and given authority to make contributions to his campaign."  (Id.; contra supra n.12.)

        At this stage, the Court need not address the merits of Santos' as-applied challenge because, by Defendant's own admission, "a constitutional 'as applied' challenge requires the record to be 'clear what the defendant did.'" (Reply at 15 (quoting Raniere, 384 F. Supp. 3d at 320-21).)  Indeed, a defendant "must wait to bring an as-applied vagueness challenge until the facts have been established by evidence introduced at trial and the fact-finder has had an opportunity to weigh in." Raniere, 384 F. Supp. 3d at 320 (quoting United States v. Ford, No. 14-CR-0045, 2016 WL 4443171, at *14 (D. Or. Aug 22, 2016)); see also Phillips, 2023 WL 5671227, at *13 ("[T]he Court requires full factual development at trial before it can determine whether the [relevant] statutes failed to provide Defendant fair warning that his conduct was prohibited by law, as required by the Due Process Clause.");

United States v. Avenatti, 432 F. Supp. 3d 354, 366 (S.D.N.Y. 2020) (denying as premature defendant's as-applied vagueness challenge to honest services charge on a motion to dismiss); United States v. Milani, 739 F. Supp. 216, 217 (S.D.N.Y. 1990) ("In the absence of a plenary trial record this Court is unable to rule on whether the statute is impermissibly vague as applied to defendant.").

In view of the foregoing, Defendant's as-applied challenge is denied without prejudice.

C. Motion to Dismiss Count Ten of the S-2 Indictment on Multiplicity Grounds

"An indictment is multiplicitous and violates the Fifth Amendment's Double Jeopardy Clause 'when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed.'" United States v. Doe, No. 22-CR-3108, 2024 WL 1231042, at *4 (2d Cir. 2024) (quoting United States v. Chacko, 169 F.3d 140, 145 (2d Cir. 1999)). "An indictment is not multiplicitous, however, if Congress intended to 'authorize separate punishments for the conduct in question.'" United States v. Hossain, 579 F. Supp. 3d 477, 482 (S.D.N.Y. 2022) (quoting United States v. Holmes, 44 F.3d 1150, 1154 (2d Cir. 1995)). "[T]he critical double jeopardy inquiry is not factual, i.e., whether the same conduct is at issue in charges brought under different statutes, but legal, i.e., whether the 'offense'—in the legal sense, as defined by Congress—complained of

in one count is the same as that charged in another." United States v. Barnaby, No. 18-CR-0033, 2021 WL 2895648, at *5 (E.D.N.Y. July 8, 2021) (quoting United States v. Basciano, 599 F.3d 184, 198 (2d Cir. 2010)).

To determine whether charges are multiplicitous, courts "apply the same-elements test established in Blockburger v. United States, 284 U.S. 299 (1932)." Id. Under Blockburger, the court inquires "whether each [statute] requires proof of a fact which the other does not." Hossain, 579 F. Supp. 3d at 482 (quoting Blockburger, 284 U.S. at 304) (alteration in original). "More explicitly, the court should 'inquire whether each offense contains an element not contained in the other; if not, they are the 'same offense' and double jeopardy bars subsequent punishment or prosecution." Id. (quoting United States v. Dixon, 509 U.S. 688, 696 (1993)).

Defendant argues, "Count 10, charging aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1), must be dismissed as multiplicitous to Count 9", charging access device fraud in violation of 18 U.S.C. § 1029(a)(5), "because the government's overly broad application of aggravated identity theft does not require proof of a fact which the access device fraud in Count 9 does not." (Support Memo at 24-25 (internal citation and alteration omitted).) Santos highlights both Counts Ten and Count Nine, the predicate felony, are based upon identical facts, i.e.,

"that Santos overcharged the credit cards of donors who contributed to his campaign." (Id. at 25.)   Defendant contends, under the Government's theory of § 1028A(a)(1)'s application, "any overcharging of another's credit card, which constitutes access device fraud, also automatically constitutes aggravated identity theft." (Id.)

In opposition, the Government succinctly highlights the Blockburger test "clearly defeats Santos's multiplicity argument" since "Section 1028A requires proof that Santos transferred, possessed, or used, a means of identification, whereas Section 1029(a)(5) does not. And unlike Section 1028A, Section 1029(a)(5) requires proof that Santos acted with intent to defraud, used an unauthorized access device, and received payment of at least $1,000." (Opp'n at 31.)   Further, the Government contends "the text of Section 1028A demonstrates that Congress 'intended to authorize separate punishments' when it explicitly mandated a two-year prison sentence for aggravated identity theft". (Id. (citation omitted)).[13]

---

[13] While the Court need not reach the merits of Santos' multiplicity arguments at this juncture, the Court notes both Parties acknowledge that, prior to Dubin, the Second Circuit had previously held a conviction for both aggravated identity theft and access device fraud did not violate the Fifth Amendment's Double Jeopardy Clause, since "cumulative punishment is authorized for" aggravated identity theft. See United States v. Abdur-Rahman, 512 F. App'x 1, 3 (2d Cir. 2013).   The Court finds unconvincing Santos' attempt to argue Dubin's narrowing of § 1028A calls into question the holding in Abdur-Rahman.

Defendant concedes this arm of his Motion is premature but avers he makes the present application "to preserve his rights" (see Support Memo at 26-27); Defendant's motion to dismiss Count Ten as multiplicitous is, therefore, denied without prejudice for this reason.  See United States v. Josephberg, 459 F.3d 350, 355 (2d Cir. 2006) ("Where two statutory sections operate independently of one another, 'there is no bar to the Government's proceeding with prosecution simultaneously under the two statutes'" (quoting Ball v. United States, 470 U.S. 856, 860 (1985))); see also United States v. Medina, No. 13-CR-0272, 2014 WL 3057917, at *3 (S.D.N.Y. July 7, 2014) (explaining, "[s]ince Josephberg, courts in this Circuit have routinely denied pre-trial motions to dismiss potentially multiplicitous counts as premature"); United States v. Mostafa, 965 F. Supp. 2d 451, 464 (S.D.N.Y. 2013) ("It is well established that the Double Jeopardy clause does not prohibit simultaneous prosecutions for the same offense; it prohibits duplicative punishment. Accordingly, multiplicity is properly addressed by the trial court at the sentencing stage. At that time, the district court would be required to vacate one of the two convictions. . . . This Court will not engage in a multiplicity inquiry at this time. In accordance with Second Circuit precedent, any such issues may be raised post-trial.") (internal citations omitted).

D. <u>Motion to Dismiss Count Nineteen of the S-2 Indictment on Duplicity Grounds</u>

"An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby." <u>United States v. Sturdivant</u>, 244 F.3d 71, 75 (2d Cir. 2001) (citing <u>United States v. Murray</u>, 618 F.2d 892, 896 (2d Cir. 1980)).  Whether a defendant has been prejudiced by a duplicitous indictment is guided by the following policy considerations:

> [A]voiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in subsequent prosecutions.

(<u>Id.</u> (quoting <u>United States v. Margiotta</u>, 646 F.2d 729, 733 (2d Cir. 1981)).  However, "the government is permitted to aggregate offenses involving discrete sums of money . . . where a series of unlawful acts 'were part of a single continuing scheme.'" <u>United States v. Wilson</u>, No. 95-CR-0668, 1997 WL 10035, at *3 (S.D.N.Y. Jan. 10, 1997) (quoting <u>United States v. Girard</u>, 601 F.2d 69, 72 (2d Cir. 1979)); <u>see also</u> <u>United States v. Rodrigues</u>, No. 22-CR-0391, 2024 WL 113744, at *4 (S.D.N.Y. Jan. 10, 2024)

(denying defendant's motion to dismiss § 641 count as duplicitous where said count grouped multiple sales under a single count since "[t]he Second Circuit addressed this question" in <u>Girard</u>, and held it was not an abuse of discretion for the district court to permit such pleading).

Count Nineteen charges Defendant with Theft of Public Money in violation of 18 U.S.C. § 641, through his alleged fraudulent application for and receipt of unemployment benefits. The S-2 Indictment provides:

> In or about and between June 2020 and April 2021, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant . . . did knowingly, willfully, and without lawful authority embezzle, steal, purloin and convert to his own use money and things of value of the United States and a department and agency thereof, to wit: money of the United States Department of the Treasury, the aggregate value of which exceeded $1,000.

(S-2 Indictment ¶ 92.)  Count Nineteen realleges and incorporates "paragraphs one through 65." (<u>Id.</u> ¶ 91.)

Defendant asserts that by realleging and incorporating paragraphs one through 65, including paragraph 59 "which appears to include a separate charge that includes conduct during a different, albeit overlapping timeframe",[14] Count Nineteen "is

---

[14] Paragraph 59 of the S-2 Indictment reads:

duplicitous because it charges two separate schemes and multiple transactions within the same count." (Support Memo at 28-29.) Defendant elaborates, Count Nineteen "'combines two or more distinct crimes into one count' because, taken as a whole, they allege one scheme that took place 'between June 2020 and April 2021' and a separate scheme that occurred from 'March 22, 2020 through April 15, 2021.'" (Id. at 29 (emphasis omitted).) Defendant maintains he "is prejudiced because the distinctive time periods do not provide adequate notice as to which of the two schemes is charged in Count 19." (Id.) Likewise, Defendant avers his prejudice is "compounded because Count 19 charges numerous individual isolated unidentified transactions over an unspecified period of time, as one scheme." (Id.)[15]

---

> For the period of approximately March 22, 2020, through April 15, 2021, based on a false application and false weekly certifications to the NYS DOL, the defendant . . . received approximately $24,744 in unemployment insurance benefits, which were deposited into Devolder Santos Bank Account #2. The benefits received by [Defendant] were fully funded by the United States and a department and agency, thereof, to wit: the United States Department of the Treasury.

(S-2 Indictment ¶ 59.)

[15] The "numerous individual transactions" to which Defendant refers are the "unspecified number of 'weekly' false certifications concerning his continuing eligibility for unemployment benefits." (Support Memo at 29.) Santos highlights "Counts 20 and 21 (the other counts related to the purported unemployment scheme) each charge Santos with wire fraud based on two discrete instances in

The Government counters, Count Nineteen "is not duplicitous because it charges a single continuing scheme" which is permissible under Second Circuit precedent.  (Opp'n at 35.) The Government explains, "the Indictment alleges that Santos first applied for unemployment insurance benefits on June 17, 2020" and, in that application, Santos "claimed to have been unemployed since the week of March 22, 2020."[16]  (Id.)  Thereafter, the S-2 Indictment alleges Santos "certified his continuing unemployment and eligibility for benefits on a weekly basis between approximately June 19, 2020, and April 15, 2021."  (Id.) Consequently, the Government contends "the Indictment appropriately identifies both the time period in which [Defendant] was certifying his eligibility for unemployment benefits, namely June 17, 2020 through April 15, 2021, and the time period that he claimed, in those certifications, to be unemployed, namely March 22, 2020 through April 15, 2021."  (Id. at 36.)

---

which he received $564.00 on two separate dates from" NYS DOL, "which necessarily leads to the conclusion that there were numerous other instances in which Santos allegedly received the remaining $23,616."  (Id.)  He maintains since "the jury could issue a conviction without actually agreeing on which specific conduct Santos committed", he is prejudiced by Count Nineteen.  (Id.)

[16] As a result of this claim, Defendant allegedly received retroactive unemployment benefits from this date forward.  (Opp'n at 35-36.)

Here, as Defendant readily concedes, Second Circuit precedent establishes that the aggregation of numerous transactions into a single count is permissible where a series of unlawful acts are part of a single continuing scheme. See Girard, 601 F.2d at 72; see also Rodrigues, 2024 WL 113744, at *4. Defendant's attempts to distinguish Girard are unpersuasive.[17] Moreover, the Court agrees with the Government that: (1) the time period of the unemployment scheme is clearly detailed in the S-2 Indictment; and (2) the numerous transactions complained of, which comprise the unemployment fraud scheme, "are identified in the Indictment's prefatory language, which describes the application for unemployment insurance benefits submitted by Santos on June 17, 2020," together with the weekly certifications submitted thereafter "throughout the charged period."  (Opp'n at 36.)

In view of the foregoing, Defendant's motion to dismiss Count Nineteen as duplicitous is denied.

---

[17] Likewise, to the extent the holding in Girard is inconsistent with the Central District of Illinois' holding in United States v. Schock, No. 16-CR-30061, 2017 WL 4780614 (C.D. Ill. Oct. 23, 2017), upon which Santos relies, the Second Circuit's holding in Girard controls.

E. <u>Motion to Compel a Bill of Particulars Pursuant to Rule 7(f)</u>

Defendant next moves for a bill of particulars pursuant to Rule 7(f), seeking an order directing the Government to identify: (1) the false statements pertaining to the Party Program Scheme charged in Counts Two through Eight; (2) the alleged victims, dates, and amounts related to the Access Device Fraud and Aggravated Identity Theft charges in Counts Nine and Ten; and (3) the transactions and additional entities involved in Counts Nine through Ten.  The Court discusses each request in turn.

1. <u>Applicable Legal Standard</u>

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars to enable him to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." <u>United States v. Bortnovsky</u>, 820 F.2d 572, 574 (2d Cir. 1987); <u>United States v. Wilson</u>, 493 F. Supp. 2d 364, 369 (E.D.N.Y. 2006). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." <u>United States v. Chen</u>, 378 F.3d 151, 163 (2d Cir. 2004) (quoting <u>United States v. Walsh</u>, 194 F.3d 37, 47 (2d Cir. 1999) (internal quotation marks omitted)).  Thus, "[t]he applicable standard for whether a bill of particulars should issue is not whether the information

57

sought would be helpful to the defense, but whether it is necessary." United States v. Taylor, 17 F. Supp. 3d 162, 178 (E.D.N.Y. 2014), aff'd, 802 F. App'x 604 (2d Cir. 2020). Consequently, "[c]ourts routinely deny motions for bills of particulars where . . . the charging document is a speaking indictment." United States v. Cordones, No. 11-CR-0205, 2022 WL 815229, at *8 (S.D.N.Y. Mar. 17, 2022); United States v. Murphy, No. 21-CR-0280, 2022 WL 1270958, at *3 (S.D.N.Y. 2022) (same). The defendant bears the burden of showing "the information sought [in a bill of particulars] is necessary and that [the defendant] will be prejudiced without it." United States v. Donovan, No. 20-CR-374, 2021 WL 5819915, at *4 (E.D.N.Y. Dec. 6, 2021) (quoting United States v. Fruchter, 104 F. Supp. 2d 289, 312 (S.D.N.Y. 2000) (internal quotation marks omitted)).

To determine whether a bill of particulars is warranted, courts may look "beyond the four corners of the indictment" and "determine whether the information sought has been provided elsewhere, such as in other items provided by discovery, [and] responses made to requests for particulars." United States v. Barrett, 153 F. Supp. 3d 552, 571 (E.D.N.Y. 2015) (citing United States v. Strawberry, 892 F. Supp. 519, 526 (S.D.N.Y. 1995)). Accordingly, a bill of particulars is unnecessary where "the indictment and/or pretrial discovery provide the defendant with sufficient information as to the nature of the charges." United

States v. Drivas, No. 10-CR-0771, 2012 WL 3011023, at *2 (E.D.N.Y. July 19, 2012) (citing Walsh, 194 F.3d at 47 (further citations omitted)).  "The Government, however, does not fulfill its obligations merely by providing mountains of documents to defense counsel who were left unguided as to the nature of the charges pending." United States v. Wey, No. 15-CR-0611, 2017 WL 237651, at *18 (S.D.N.Y. Jan. 18, 2017) (citing United States v. Lino, No. 00-CR-0632, 2001 WL 8356, at *4 (S.D.N.Y. Jan. 2, 2001) (further citations and quotation marks omitted)).

The decision of whether to grant or deny a motion for a bill of particulars rests within the sound discretion of the district court and is reviewed only for abuse of discretion. United States v. Cephas, 937 F.2d 816, 823 (2d Cir. 1991); United States v. Ramirez, 609 F.3d 495, 502 (2d Cir. 2010); United States v. Barrera, 950 F. Supp. 2d 461, 477 (E.D.N.Y. 2013).

2. Identification of Allegedly False Statements Related to Counts Two Through Eight of the S-2 Indictment

Defendant's first request "relates to the identification of falsehoods pertaining to the 'Party Program Scheme' charged in Counts 2-8." (Support Memo at 33.)  Defendant argues, "[w]hile the [S-2] Indictment identifies several allegedly fraudulent statements pertaining" to Counts Two through Eight, language in paragraphs 22, and 32, "indicates that the identified falsehoods

59

are not exhaustive." (Id. at 34.) Defendant avers, "[w]ithout identification of [these] statements" he cannot "properly prepare his defense." (Id. at 35.) Defendant explains, "[t]he two FEC filings pertaining to Counts 2-8 . . . total more than 500 pages and contain more than 1,000 different statements concerning Santos' fundraising activities." (Id.) Additionally, Defendant highlights "discovery in this case has exceeded 1.3 million pages of discovery material" necessitating the instant request. (Id.)

The Government's opposition rests upon two bases. First, the Government stresses that the speaking indictment in this case "goes well beyond merely tracking the language of the statute and stating the time and place in approximate terms", which, as the Government states, "is all an indictment must do to satisfy the pleading standard of Federal Rule of Criminal Procedure 7." (Opp'n at 41 (quotation marks and alterations omitted)). Second, the Government emphasizes, by Defendant's own admission, that the "[S-2] Indictment adequately puts Santos on notice as to numerous specific false statements relevant to each count." (Id.) For example, the Government highlights:

> Counts Two and Three, . . . both identify the specific wires that constitute the basis for charges—namely, the submission of the "Year-End 2021 Report to the FEC referenced in paragraph 27" (Count Two) and the submission of the "April 2022 Quarterly Report to the FEC referenced in paragraph 38" (Count Three). Paragraph 27, in turn, identifies the specific, falsified contributions reported to

the FEC, including details such as the amount
reported, the date of the purported
contribution, and the identities of the
putative contributors. Paragraph 38 likewise
identifies the false representations in the
April 2022 Quarterly Report, including the
"false[] report[] that DEVOLDER SANTOS had
loaned the Committee $500,000 on March 31,
2022."

Counts Four and Five, . . . are similarly
detailed and specific. Each of those counts
enumerates twelve particularized false
statements, including such details as the
dates the false statements were made, the
title of the report in which they were made,
and the recipient of the report.

Count Six . . . specifically identifies the
means of identification that were used without
authority (names) and identifies each person
whose name was improperly used.

Count Seven . . . states that Santos caused
the Committee to make the false statement to
the FEC that Santos "had loaned the Committee
$500,000 on March 31, 2022."

Count Eight . . . [l]ike Count
Seven, . . . identifies the falsified
document as the April 2022 Quarterly Report
that was submitted to the FEC on or about April
15, 2022. It further describes the report as
containing the false statement that Santos
"had loaned the Committee $500,000 on March
31, 2022," when, "in truth and in fact, . . .
[Santos] had not loaned the Committee $500,000
on March 31, 2022."

(Opp'n at 41-42 (internal citations and footnote omitted).)

Here, because the Court agrees with the Government that

the information in the S-2 Indictment adequately informs Santos of

the charges levied against him in Counts Two through Eight, and,

since the speaking indictment sufficiently identifies the numerous alleged false statements pertinent to each count (see Opp'n at 41-42), such that Defendant is able to prepare his defense, the Court finds no bill of particulars is required. See United States v. Ferguson, 478 F. Supp. 2d 220, 226-37 (D. Conn. 2007) (denying request for bill of particulars seeking identification of false statements, notwithstanding voluminous nature of discovery, where, inter alia, "the degree of detail in the indictment" was sufficiently particular). Indeed, and as aptly argued by the Government, "[a] bill of particulars should not be treated 'as a general investigative tool for the defense, or as a device to compel disclosure of the Government's evidence or its legal theory prior to trial'" United States v. Sterritt, 678 F. Supp. 3d 317, 327 (E.D.N.Y. 2023) (quoting United States v. Feola, 651 F. Supp. 1068, 1123 (S.D.N.Y. 1987)); see also United States v. Tournant, No. 22-CR-0276, 2023 WL 8649893, at *4-5 (S.D.N.Y. Dec. 13, 2023) (denying motion for bill of particulars since, "[a]t this stage, the kind of granular particularization requested by [defendant] would be a detailed guide to the Government's evidence, and would also force the Government to tip its hand as to its strategy.").[18]

---

[18] As to Santos' request for a bill of particulars regarding Counts Nine and Ten, given the Government's representation it has, out of an abundance of caution, "elected . . . to voluntarily provide under separate cover additional detail as to the specific, unauthorized transactions and attempted transactions initiated by Santos", the Court finds this section of Santos' motion moot.

F. Motion to Compel Production and Disclosure Under
   *Brady/Giglio*

Pursuant to Brady and its progeny, "the Government has
a constitutional duty to disclose favorable evidence to the accused
where such evidence is 'material' either to guilt or to
punishment." United States v. Paulino, 445 F.3d 211, 224 (2d Cir.
2006) (quoting United States v. Jackson, 345 F.3d 59, 70 (2d Cir.
2003)). "Favorable evidence includes not only evidence that tends
to exculpate the accused, but also evidence that is useful to
impeach the credibility of a government witness", so called "Giglio
material". Jackson, 345 F.3d at 70 (quoting United States v.
Coppa, 267 F.3d 132, 139 (2d Cir. 2001)). It is a well-settled
rule of law "that the government need not immediately disclose
Brady or Giglio material simply upon request by the defendant."
United States v. Barret, 824 F. Supp. 2d 419, 455 (E.D.N.Y. 2011)
(citing Coppa, 267 F.3d at 146). Instead, "the government must
disclose all Brady and Giglio material 'in time for its effective
use at trial.'" Id.; see also Coppa, 267 F.3d at 142 ("Like the
extent of the required disclosure, the timing of a disclosure
required by Brady is also dependent upon the anticipated remedy
for a violation of the obligation to disclose: the prosecutor must
disclose 'material' (in the Agurs/Brady sense) exculpatory and

_____

Moreover, the Court notes Santos does not dispute the Government's
characterization of this section of his motion. (See Reply, in
toto.)

impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made. Thus, we have never interpreted due process of law as requiring more than that Brady material must be disclosed in time for its effective use at trial."); Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir. 2001) ("It is not feasible or desirable to specify the extent or timing of disclosure Brady and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made. Thus disclosure prior to trial is not mandated.").

Here, Defendant asserts the Government has, thus far, provided "two Brady disclosures, which together identified at least three witnesses that provided information to the government that is [allegedly] exculpatory" and/or can be characterized as Giglio material. (Support Memo at 42.) Defendant argues, notwithstanding the Government has provided summaries of the sum and substance of what these three witnesses told the Government, such disclosure is insufficient. Defendant contends, to make effective use of that information prior to trial, production "of the underlying notes/memos [and] [FD]302s" is required. (Id. at 46.)

As an initial matter, the Government emphasizes it "understands its various discovery obligations under Brady, Giglio

and their progeny", it "has complied with those obligations", and "will continue to do so." (Opp'n at 48.) Notwithstanding its previous disclosure of the at-issue witness statements, however, the Government disputes Santos' characterization of these statements as "exculpatory." (Id.) Regardless, the Government contends Santos' request for disclosure of Brady material is moot since summaries of the witnesses statements, "excerpted from the underlying FD-302s, were already provided to Santos months ago." (Id. at 50.) Furthermore, the Government maintains "many of Santos' arguments regarding the FD-302s and notes sound in Giglio and his preparation to impeach potential government witnesses." (Id. at 51.) This is important, the Government avers, since Second Circuit law clearly establishes there is no pre-trial right to Giglio material. (Id.) The Government reemphasizes it is aware of its obligations under Giglio and represents "it will adhere to the customary practice in this district and produce Giglio material prior to the testimony of its witnesses." (Id. (internal citation omitted).)

Regarding Defendant's Brady request, the Court is satisfied by the Government's representations that it understands, has complied with, and will continue to comply with, its Brady obligations. The Court is unconvinced by Defendant's attempts to otherwise discredit those representations. See United States v. Mohamed, 148 F. Supp. 3d 232, 246 (E.D.N.Y. 2015) ("Courts in the

Second Circuit generally do not compel immediate disclosure of Brady/Giglio materials where (1) the Government represents it is aware of and will comply with its Brady/Giglio obligations, and (2) the Defense does not provide any reason for suspecting the Government will not comply") (collecting cases); see also United States v. Murgio, 209 F. Supp. 3d 698, 726 (S.D.N.Y. 2016) (declining to order early disclosure of Brady/Giglio material where "[t]he Government acknowledge[d] its obligations under Brady and Giglio in its opposition brief, and it pledge[d] to provide such materials in a timely manner."). Indeed, Santos has been in possession of the summarized witness statements since approximately March 14, 2024 (see Support Memo at 8, 42-44). The trial in this case is scheduled to begin on September 9, 2024. Six months is more than sufficient time for Defendant to make use of the witness statements in advance of trial. See United States v. Mavashev, No. 08-CR-0902, 2010 WL 670083, at *2-3 (E.D.N.Y. Feb. 23, 2010) (finding, where "the government has already disclosed to defendant—months before the start of trial—" the identity of potentially exculpatory witnesses, together with descriptions of "the nature of the exculpatory information possessed by each of these witnesses", such disclosure was sufficient under Brady). Likewise, the Court finds, consistent with the findings of other courts in this Circuit, that the witness statements the Government has provided, which were summarized from

the underlying FD-302s, are sufficient under Brady.[19]   See United States v. Collins, 409 F. Supp. 3d 228, 244-45 (S.D.N.Y. 2019) ("Defendants do not cite case law that supports their argument that the Government is required to produce primary materials containing exculpatory statements . . . to meet its Brady obligation. This is not surprising because such disclosure is not legally required; rather, in order to meet its Brady obligation the Government need only disclose 'the essential facts which would enable [the defendants] to call the witness[es] and thus take advantage of any exculpatory testimony that [they] might

---

[19] Santos contends his request "for production of the underlying notes/memos [and] 302s does not go unsupported by the law". (Support Memo at 46-47 (citing United States v. Triumph Capital Group, Inc., 544 F.3d 149, 161 (2d Cir. 2008)).)   However, in Triumph, the Second Circuit did not hold that the government failed to comply with its Brady obligations by withholding an FBI agents proffer notes; instead, the Second Circuit found a Brady violation where the contents of the undisclosed FBI proffer notes were materially different from the contents of said witness's statements in a disclosed interview report, and at trial.   Triumph, 544 F.3d at 161-62.   The Second Circuit highlighted, "[t]he proffer notes support[ed] an alternative version" of a conversation about finder's fees which was "entirely at odds with the government's theory of the case", was "directly relevant to the intent element of the consulting contract bribe charges", and which defendant "could have used . . . not merely to support his version of [events] . . . but also to impeach [the witness's] credibility". Id. at 162.

Here, the Government represents it has provided accurate summaries of the pertinent witness statements from the FD-302s, and, moreover, that it understands its obligations under Rule 16, Brady, Giglio, and 18 U.S.C. § 3500, and will comply with them "including by preserving and producing all such materials to the defense at the appropriate time."   (Opp'n at 53-54.)   Consequently, Santos' cited case law is inapposite.

furnish.'" (quoting United States v. Stewart, 513 F.2d 957, 960 (2d Cir. 1975))); see also Mavashev, 2010 WL 670083, at *2-3.

Regarding Defendant's request for an order compelling disclosure of Giglio material, such request must be denied since "there is no pretrial right" to such materials. See United States v. Inniss, No. 18-CR-0134, 2019 WL 6117987, at *3 (E.D.N.Y. Nov. 18, 2019); see also United States v. Shkreli, No. 15-CR-0637, 2016 WL 8711065, at *3 ("There is no pre-trial right to Giglio material, which specifically concerns impeachments. Nor is there a pre-trial right to statements and reports of witnesses in the Government's possession."). Based upon the Government's representation that it "intends to produce any additional Giglio material regarding its trial witnesses at the time it produces its Jencks Act material", which is customary in this District, the Court, in its discretion, denies Defendant's motion for immediate disclosure of Giglio material at this time. Accord United States v. Saliba, No. 08-CR-0792, 2010 WL 680986, at *4 (E.D.N.Y. Feb. 24, 2010) (denying request for immediate disclosure of Giglio material where trial was more than one month away and the Government represented "it will disclose Giglio material 'shortly before trial in keeping with standard practice in the District'"); United States v. Persing, No. 06-CR-0815, 2008 WL 11344620, at *4 (E.D.N.Y. May 6, 2008) ("The government has agreed to adhere to the customary

practice in this district and produce <u>Giglio</u> material prior to the testimony of its witnesses. That is sufficient.").[20]

      G. <u>Motion to Strike Prejudicial Surplusage from the S-2 Indictment Pursuant to Rule 7(d)</u>

Finally, Defendant moves pursuant to Rule 7(d) "to strike prejudicial and irrelevant language" from the S-2 Indictment.

However, the Parties agree that "[t]o the extent the Court does not plan to present the Indictment to the jury at trial, Santos's motion to strike surplusage can be denied as moot." (Opp'n at 55 n.17.; <u>see also</u> Reply at 5 n.1.) The Court confirms it does not intend to provide the jury with a copy of the S-2 Indictment to refer to during their deliberations; Defendant's motion to strike is therefore denied as moot. <u>Accord</u> <u>United States v. Adelglass</u>, No. 20-CR-0605, 2022 WL 6763791, at *5 (S.D.N.Y. Oct. 11, 2022) ("[T]his Court's uniform policy is never to present an indictment to the jury, and so . . . this motion is denied as

---

[20] Relatedly, Defendant also sought an order directing the Government to "preserve the rough notes and other evidence taken by law enforcement agents during their interviews with all witnesses." (Support Memo at 50.) Based upon the Government's representations that: (1) it "understands that all rough notes have been, or are in the process of being, incorporated into official reports"; and (2) "consistent with its usual practice" it has "already directed law enforcement agents to preserve all rough notes of its interviews of witnesses and related evidence" (Opp'n at 54), the Court denies Defendant's motion to preserve as moot. <u>See, e.g.</u>, <u>United States v. Guevara</u>, No. 99-CR-0445, 1999 WL 639720, at *3 (S.D.N.Y. Aug. 23, 1999); <u>United States v. Brown</u>, 627 F. Supp. 3d 206, 241 (E.D.N.Y. 2022).

moot"); <u>United States v. Doyle</u>, No. 16-CR-0506, 2018 WL 1902506, at *6 (S.D.N.Y. Apr. 19, 2018) (characterizing as "academic" defendants' motion to strike surplusage from the indictment where the court "does not typically read portions of the indictment to the jurors at trial.").

CONCLUSION[21]

For the stated reasons, **IT IS HEREBY ORDERED that** Defendant's Omnibus Motion (ECF No. 71) is DENIED IN ITS ENTIRERY. Specifically:

1. Defendant's Motion to Dismiss the aggravated identity theft charges (Count Six and Ten) of the S-2 Indictment for failure to state a claim is DENIED;

2. Defendant's Motion to Dismiss the aggravated identity theft charges (Count Six and Ten) of the S-2 Indictment because 18 U.S.C. § 1028A is unconstitutionally vague on its face is DENIED;

3. Defendant's Motion to Dismiss the aggravated identity theft charges (Counts Six and Ten) of the S-2 Indictment because 18 U.S.C. § 1028A is unconstitutionally vague as applied to his case is DENIED WITHOUT PREJUDICE;

---

[21] To the extent not explicitly addressed, the Court has considered the remainder of Defendant's arguments and finds them to be without merit.

4. Defendant's Motion to Dismiss Count Ten on grounds of multiplicity is DENIED WITHOUT PREJUDICE;

5. Defendant's Motion to Dismiss Count Nineteen of the S-2 Indictment on grounds of duplicity is DENIED;

6. Defendant's Motion for an order compelling the Government to provide a bill of particulars, to the extent such request was not mooted by the Government's voluntary disclosures, is DENIED;

7. Defendant's Motion for an order compelling the Government to provide Brady/Giglio material is DENIED;

8. Defendant's Motion to strike surplusage from the S-2 Indictment is DENIED AS MOOT;

9. Defendant's Motion for an order compelling the Government to preserve is DENIED AS MOOT; and

10. Defendant's Motion for an order permitting the defense to supplement his various motions to dismiss is DENIED.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: July 19, 2024
       Central Islip, New York