UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

GEORGE ANTHONY DEVOLDER SANTOS,
 Also known as "George Santos"

*Defendant.*

23-197 (S-2) (JS) (AYS)

**DEFENDANT GEORGE ANTHONY DEVOLDER SANTOS' MEMORANDUM OF
LAW IN SUPPORT OF HIS MOTIONS FOR A PARTIALLY ANONYMOUS JURY
AND A WRITTEN JUROR QUESTIONNAIRE IN ADVANCE OF *VOIR DIRE***

**JOSEPH W. MURRAY, ESQ.**
 185 Great Neck Road, Ste. 461
Great Neck, New York 11021
(646) 838 – 1702
joe@jmurray-law.com


**MANCILLA & FANTONE, LLP**
260 Madison Avenue, 22nd Floor
New York, New York 10016
(646) 225-6686
robert@law-mf.com
andrew@law-mf.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iv

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 2

    A.   NEGATIVE PORTRAYAL IN THE MEDIA IN GENERAL ......................................... 3

    B.   NEGATIVE PORTRAYAL FROM INDICTMENT AND HOUSE EXPULSION ......... 4

    C.   SANTOS' POLITICAL OPINIONS ................................................................................ 6

I.       MOTION FOR A PARTIALLY ANONYMOUS JURY ...................................................... 7

    A.   LEGAL STANDARD..................................................................................................... 7

    B.   ARGUMENT ................................................................................................................... 9

II.      MOTION FOR A JURY QUESTIONNAIRE.................................................................. 15

    A.   LEGAL STANDARD................................................................................................... 15

    B.   ARGUMENT ................................................................................................................. 17

      i.   A Written Questionnaire Is Necessary To Ensure A Fair And Impartial Jury ............. 17

          a.   Extensive Pretrial Publicity Necessitates Thorough Screening ............................... 17

          b.   Efficiency Of The Trial Process ............................................................................ 20

      ii.   The Proposed Areas Of Inquiry In The Questionnaire Are Directly  Relevant To The Potential Biases and Risks Present By Virtue Of The High Profile Nature Of This Case ... 22

          a.   Exposure to media coverage related to the case ..................................................... 23

          b.   Knowledge of the defendant, witnesses, and parties involved ................................ 23

          c.   Political affiliations and potential biases ................................................................. 23

d. Understanding of financial crimes and relevant legal concepts ................................ 24

CONCLUSION ......................................................................................................................... 24

# TABLE OF AUTHORITIES

*CASES*

*Bowers v. Walsh*,
    277 F. Supp. 2d 208 (W.D.N.Y. 2003) ............................................................. 18

*Jovanovic v. City of New York*,
    No. 04-cv-8437; 2010 WL 8500283 (S.D.N.Y. Sept. 29, 2010) ....................................... 15

*Sheppard v. Maxwell*,
    384 U.S. 333 (1966) .......................................................................... 18

*Skilling v. United States*,
    561 U.S. 358 (2010) ............................................................ 6, 15, 16, 16

*Steinberg v. Comm'r of Corr. Servs.*,
    No. 92-cv-7907; 1998 WL 259948 (S.D.N.Y. May 18, 1998) ....................................... 16

*United States v. Al Fawwaz*,
    57 F. Supp. 3d 307 (S.D.N.Y. 2014) ............................................................... 7

*United States v. Amuso*,
    21 F.3d 1251 (2d Cir. 1994) .................................................................... 8

*United States v. Ashburn*,
    2014 U.S. Dist. LEXIS 158657 (E.D.N.Y. Nov. 7, 2014) ....................................... 8

*United States v. Avenatti*,
    2021 U.S. Dist. LEXIS 125442 (S.D.N.Y. July 6, 2021) ....................................... 15

*United States v. Awadallah*,
    457 F. Supp. 2d 246 (S.D.N.Y. 2006) ............................................................ 21

*United States v. Bloeth*,
    313 F.2d 364 (2d Cir. 1963) .................................................................... 17

*United States v. Brown*,
    2022 U.S. Dist. LEXIS 177874 (E.D.N.Y. Sep. 29, 2022) ....................................... 8, 14

*United States v. Brown*,
    303 F.3d 582 (5th Cir. 2002) .................................................................. 16

*United States v. Bruno*,
    700 F. Supp. 2d 175 (N.D.N.Y. 2010) ................................................... 19, 20, 21

*United States v. Loera,*
    2019 U.S. Dist. LEXIS 111566 (E.D.N.Y. July 3, 2019) ................................... 20

*United States v. Loera, 09-CR-466 (BMC),*
    2018 U.S. Dist. LEXIS 185689; 2018 WL 5624143 (2018) ........................................ 15, 21

*United States v. Muyet,*
    945 F. Supp. 586 (S.D.N.Y. 1996) .......................................................................... 16

*United States v. Nieves,*
    58 F.4th 623 (2d Cir. 2023) ..................................................................................... 16

*United States v. Paccione,*
    949 F.2d 1183 (2d Cir. 1991) ..................................................................................... 7

*United States v. Pica,*
    692 F.3d 79 (2d Cir. 2012) ......................................................................................... 7

*United States v. Poulsen,*
    655 F.3d 492 (6th Cir. 2011) ................................................................................... 16

*United States v. Prado,*
    2011 U.S. Dist. LEXIS 86631 (E.D.N.Y. Aug. 5, 2011) .............................................. 8, 13

*United States v. Pugh,*
    150 F. Supp. 3d 218 (E.D.N.Y. 2015) ....................................................................... 7

*United States v. Quinones,*
    511 F.3d 289 (2d Cir. 2007) ............................................................................. 8, 15, 16, 20

*United States v. Rahman,*
    189 F.3d 88 (2d Cir. 1999) ................................................................................. 15, 20, 21

*United States v. Raniere,*
    2019 U.S. Dist. LEXIS 110735 (E.D.N.Y. July 2, 2019) ................................... 19

*United States v. Sattar,*
    395 F. Supp. 2d 66 (S.D.N.Y. 2005) ....................................................................... 16

*United States v. Simon,*
    664 F. Supp. 780 (S.D.N.Y. 1987) ........................................................................... 18

*United States v. Stewart,*
    317 F. Supp. 2d 432 (S.D.N.Y. 2004) ..................................................................... 19

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006)........................................................................ 15, 15

*United States v. Thai*,
    29 F.3d 785 (2d Cir. 1994)............................................................................ 8, 9

*United States v. Vario*,
    943 F.2d 236 (2d. Cir. 1991)......................................................................... 7, 8

*United States v. Wecht*,
    537 F.3d 222 (3d Cir. 2008).......................................................................... 16

*United States v. Wilson*,
    925 F. Supp. 2d 410 (E.D.N.Y. 2013) .......................................................... 21

*United States v. Wong*,
    40 F.3d 1347 (2d Cir. 1994)........................................................................... 8, 9

## PRELIMINARY STATEMENT

The defendant, George Anthony Devolder Santos ("Santos"), respectfully submits this memorandum of law in support of his motions for (1) a partially anonymous jury and (2) a written juror questionnaire to be distributed in advance of *voir dire*.  Defense counsel has conferred with the government regarding the instant applications and the government consents to a partially anonymous jury, but objects to a written juror questionnaire.

With respect to the first motion, we respectfully request that the Court empanel a partially anonymous jury in this case (confining disclosure of the jurors' identities to the parties, attorneys (and staff), and the Court) due to the extraordinary level of media attention surrounding Santos and the significant risks this publicity poses to juror safety, privacy, and impartiality.  The extensive and largely negative media coverage, combined with the political nature of the case, creates a substantial risk that jurors could face harassment or intimidation if their identities are known, potentially compromising the fairness of the trial.  Additionally, the mere risk of public ridicule could influence the individual jurors ability to decide Santos' case solely on the facts and law as presented in Court.

With respect to the second motion, we respectfully request that the Court utilize a written jury questionnaire (a draft of which is annexed as Exhibit "A" to the Declaration of Andrew Mancilla dated August 6, 2024 ("Mancilla Decl.")) because it would serve several purposes critical to a case such as this.[1]  First, it would allow for a more thorough and efficient screening of potential jurors, helping to identify those who may have been unduly influenced by pretrial publicity or who harbor preconceived notions about the case.  Second, it would provide a means to delve into sensitive topics that prospective jurors might be reluctant to discuss in open court.

---

[1] The government was provided with this proposed juror questionnaire prior to objecting to it.

Finally, it would streamline the *voir dire* process, potentially saving valuable court time while ensuring a comprehensive examination of the jury pool.

Given the extraordinary circumstances surrounding this case, including the high-profile nature and the extensive media coverage it has garnered, a written questionnaire is not only appropriate but necessary to ensure the selection of a fair and impartial jury.

## FACTUAL BACKGROUND

On May 28, 2024, a federal grand jury in the Eastern District of New York returned a 23-count superseding indictment against Santos. These allegations stem from Santos' 2022 congressional campaign and his personal financial dealings and include charges of wire fraud, false statements to the Federal Elections Commission, identity theft, and unlawful monetary transactions, among others. *Id.*

The charges have garnered intense media scrutiny and public interest. Since the initial original indictment was unsealed in May 2023, major news outlets including The New York Times, The Washington Post, CNN, and Fox News have published hundreds of articles and broadcasted numerous reports about the case.

On December 19, 2022, *The New York Times* published an article describing numerous allegedly false claims and other misrepresentations made by Santos.[2] Throughout December 2022, The New York Times continued to release multiple articles accusing Santos of lies and deceit.[3] Following the indictment of the Defendant in May 2023, the New York media

---

[2] December 19, 2022, *New York Times*, "Who Is Rep.-Elect George Santos? His Résumé May Be Largely Fiction." https://www.nytimes.com/2022/12/19/nyregion/george-santos-ny-republicans.html?searchResultPosition=25
[3] *See*, *e.g.*, December 21, 2022, *New York Times*, "Did George Santos Also Mislead Voters About His Jewish Descent?" https://www.nytimes.com/2022/12/21/nyregion/george-santos-jewish-descent-fraud.html?searchResultPosition=32; December 23, 2022, *New York Times*, "George Santos's Early Life: Odd Jobs, Bad Debts and Lawsuits." https://www.nytimes.com/2022/12/23/nyregion/george-santos-republican-resume.html?searchResultPosition=39

persistently published numerous articles portraying Santos as a liar and fraud, frequently using his name to attract attention.[4]  Since December 2022, the approximate number of articles mentioning Santos in New York media is as follows:

- *The New York Times*: 508

- *New York Daily News*: 361

- *New York Post*: 556

- *Wall Street Journal*: 124

Mancilla Decl. at ¶4.

## A.     NEGATIVE PORTRAYAL IN THE MEDIA IN GENERAL

As shown above, Santos has been the subject of numerous stories and headlines across national and New York media.  Specifically the media often portrays him in a negative light as a liar, fraud, and manipulator.[5]  Outlets have gone so far as to say "Santos lies like people breathe," while alleging a multitude of "cons and deceptions."[6]  Frequently, Santos has been included in the narrative of being a "con artist" such as in an article from *The New Yorker* titled "George Santos and the Art of the Scam," which was essentially used as a promotion for their "Critics At Large" podcast episode about other famous scammers.[7]

Santos' personal life has been under attack by media outlets as well, with everything from his personal relationships to his appearance facing criticism.  *ABC News* reported that

---

[4] *See*, *e.g.*, March 8, 2024, *New York Magazine*, "Here's Every Single Lie Told By George Santos." https://nymag.com/intelligencer/article/guide-george-santos-lies.html; January 20, 2023, *New York Daily News*, "George Santos lied about his mom being in the South Tower on 9/11, records show."

[5] *See*, December 1, 2023, *MSNBC*, "George Santos' time in the House of Representatives was 331 days too long." https://www.msnbc.com/opinion/msnbc-opinion/george-santos-expulsion-lies-congress-rcna127260

[6] December 1, 2023, *Vanity Fair*, "George Santos Has Been Booted From Congress: A Look Back At His Most Absurd Lies and Cons." https://www.vanityfair.com/news/2023/01/george-santos-worst-lies

[7] December 14, 2023, *The New Yorker*, "George Santos and the Art of the Scam" https://www.newyorker.com/podcast/critics-at-large/george-santos-and-the-art-of-the-scam

Santos' ex-boyfriends accused him of having "turned toxic due to a flood of lies that Santos told to try to manipulate and trap them."[8]  Numerous news outlets have commented on the allegations against Santos' use of campaign funds for personal expenses such as botox, which has led to journalists commenting on his appearance, going so far as to say "the ascent of the gay millennial Botox Republican who bonds with staffers over their respective injectables routines feels like the dawn of a new era of shamelessness in Congress."[9]  An article from *Rolling Stone* showcased the widespread attention on Santos' personal life and appearance, while comedian Bowen Yang appeared on *Saturday Night Live's* Weekend Update segment as Santos to discuss "his" experience with botox claiming to have gotten "a whole lot of botox," all in the persona of the Defendant.[10]  The SNL skit generated numerous articles and stories from a multitude of outlets, most of which present Santos in an unfavorable light.[11]

## B.    NEGATIVE PORTRAYAL FROM INDICTMENT AND HOUSE EXPULSION

In the approximate three week span from May 9, 2023, the day that Santos was indicted, until the end of June 2023, the *New York Times* alone published 41 articles involving George Santos. Mancilla Decl. at ¶5.  The article topics ranged from general details of the indictment to

---

[8] February 1, 2023, *ABC News*, "George Santos' ex-boyfriends say they were left feeling trapped, manipulated" https://abc7chicago.com/george-santos-scandal-ex-boyfriends-react/12758682/

[9] February 3, 2023, *Slate*, "We Finally Know How George Santos Gets His Amazing Skin" https://slate.com/news-and-politics/2023/02/george-santos-botox-smooth-skin-glowing.html

[10] November 19, 2023, *Rolling Stone*, "'SNL' Weekend Update Goes After George Santos' Botox, OnlyFans Grifts" https://www.rollingstone.com/tv-movies/tv-movie-news/snl-weekend-update-goes-after-george-santos-botox-onlyfans-grifts-1234886642/

[11] See, e.g., November 19, 2023, *The New York Post*, "'SNL' spoofs George Santos' OnlyFans and Botox use, deploys panda to Biden presser" https://nypost.com/2023/11/19/entertainment/snl-spoofs-george-santos-onlyfans-use-deploys-panda-to-biden-presser/; November 21, 2023, *Independen*t, "SNL stars can't stop laughing in brutal George Santos skit" https://www.independent.co.uk/arts-entertainment/tv/george-santos-snl-botox-onlyfans-b2454174.html; November 18, 2023, *Variety*, 'SNL': Bowen Yang Plays George Santos and Explains His OnlyFans and Botox Spending" https://variety.com/2023/tv/news/snl-george-santos-bowen-yang-weekend-update-1235799897/

Santos' "Spectacularly Dumb Alleged Scheme."[12]  Other media outlets also widely covered the indictment, with the *New York Daily News* publishing headlines such as "Lying Congressman George Santos," detailing the allegations.[13]

Following the indictment, Santos was expelled from congress in December 2023. This event further fueled negative media coverage, with headlines like "George Santos Has Been Kicked Out of Congress, Finally"[14] and "George Santos Was Finally Too Much for Republicans."[15]  Since his indictment and subsequent expulsion from Congress, the media coverage has consistently portrayed him negatively, reinforcing the narrative of his untrustworthiness.

The media's portrayal of Santos is not limited to the frequency of negative headlines but also includes in-depth analyses and opinion pieces that dissect his actions and character.[16] This continuous scrutiny has shaped public perception, leading to widespread criticism leading to a potentially lasting image of dishonesty and corruption in the public eye.

---

[12] May 10, 2023, *New York Times*, "George Santos's Spectacularly Dumb Alleged Scheme" https://www.nytimes.com/2023/05/10/opinion/george-santos-money-campaign.html?searchResultPosition=15

[13] May 11, 2023, *New York Daily News*, "Lying Congressman George Santos out on bail after not guilty plea to federal charges of fraud, theft of public funds, money laundering, false statements" https://www.nydailynews.com/2023/05/10/lying-congressman-george-santos-out-on-bail-after-not-guilty-plea-to-federal-charges-of-fraud-theft-of-public-funds-money-laundering-false-statements/

[14] December 1, 2023, *Rolling Stone*, "George Santos Has Been Kicked Out of Congress, Finally" https://www.rollingstone.com/politics/politics-news/george-santos-expelled-congress-1234905936/

[15] December 1, 2023, *The Atlantic*, "George Santos Was Finally Too Much For Republicans" https://www.theatlantic.com/politics/archive/2023/12/george-santos-expulsion-vote-republicans/676207/

[16] *See*, December 4, 2023, *The National Law Journal*, "The Santos Expulsion: A Milestone in Congressional Governance and Ethics" https://www.law.com/nationallawjournal/2023/12/04/the-santos-expulsion-a-milestone-in-congressional-governance-and-ethics/

## C.    SANTOS' POLITICAL OPINIONS

As a member of congress, Santos has been outspoken about his political and personal views which have in turn been highly publicized by the media.  The media has highlighted views such as his stance on gun-control[17] and international relations such as the Israel-Palestine conflict.[18]  The media continue to showcase his views on highly divisive political topics and continuously publicize his past and current political involvement.[19]  The public nature of his beliefs has led to continued criticism and perpetuated public hate of his political affiliation and views.[20]

This pervasive publicity presents significant challenges to seating an impartial jury. Many potential jurors may have been exposed to prejudicial information or formed opinions about Santos and the case before entering the courtroom. *See Skilling v. United States*, 561 U.S. 358, 377-78 (2010) (discussing the challenges of jury selection in high-profile cases). It is in this context that we argue for the necessity of an anonymous jury and a written juror questionnaire to ensure a fair and impartial trial.

---

[17] February 23, 2023, *CBS News*, Rep. George Santos backs bill to make AR-15 assault rifle the 'national gun of the United States'" https://www.cbsnews.com/newyork/news/george-santos-ar-15-assault-rifle-national-gun-of-the-united-states/

[18] October 13, 2023, *Forbes*, "George Santos Calls Man 'Human Scum' In Shouting Match Over Israel-Hamas Conflict" https://www.forbes.com/sites/antoniopequenoiv/2023/10/13/george-santos-calls-man-human-scum-in-shouting-match-over-israel-hamas-conflict/

[19] *See*, March 22, 2024, *CNN*, "George Santos says he's leaving the Republican Party and will run for Congress as an independent" https://www.cnn.com/2024/03/22/politics/george-santos-independent-republican-congress/index.html

[20] *See*, November 18, 2023, *New York Times*, "Geore Santos Is More Dangerous Than You Know" https://www.nytimes.com/2023/11/18/opinion/george-santos-republican-party.html

# I. MOTION FOR A PARTIALLY ANONYMOUS JURY

Santos moves for a partially anonymous jury, confining disclosure of the jurors' identities to the parties, attorneys (and staff), and the Court. The government consents to this request.

## A. LEGAL STANDARD

The empanelment of an anonymous jury is an extreme measure that should be taken only in limited circumstances. *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991). However, a district court may order the empanelment of an anonymous jury upon "(a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012) (internal quotation marks omitted).

"In determining whether there is strong reason to believe the jury needs protection, courts in this circuit have considered various factors, 'including whether (1) the charges against the defendants are serious, (2) there is a substantial potential threat of corruption to the judicial process, and (3) considerable media coverage of the trial is anticipated.'" *United States v. Pugh*, 150 F. Supp. 3d 218, 222 (E.D.N.Y. 2015) (*citing and quoting United States v. Al Fawwaz*, 57 F. Supp. 3d 307, 309 (S.D.N.Y. 2014)). "While 'it is unclear whether any of these factors individually justify impaneling an anonymous jury,' 'there are numerous cases indicating that anonymity is appropriate when some combination of these factors is present.' *Id.* (internal citations and quotations omitted).

"When genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights." *United States v. Vario* 943 F.2d 236, 239 (2d. Cir. 1991). In reviewing whether an anonymous jury is appropriate, courts "balance the defendant's interest in

conducting meaningful voir dire and in maintaining the presumption of innocence, against [the jury's] interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict." *Quinones*, 511 F.3d at 295 (*quoting United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994)).

Notably, in cases where there is a significant amount of coverage from the print and broadcast media, it is reasonable to predict that additional press coverage will accompany the trial. *United States v. Wong*, 40 F.3d 1347, 1377 (2d Cir. 1994). "The prospect of publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or harassment." *Id.* (*citing Vario*, 943 F.2d at 240); *see also United States v. Brown*, No. 20-CR-293 (WFK), 2022 U.S. Dist. LEXIS 177874, at *9 (E.D.N.Y. Sep. 29, 2022)(In determining whether "there is strong reason to believe the jury needs protection"—courts in this circuit consider […] "whether the trial is likely to attract media attention, as may be illustrated by the nature and degree of pretrial publicity.")

"[T]he Second Circuit has repeatedly held that a defendant's presumption of innocence is properly maintained where the court gives a neutral and non-prejudicial explanation to the jury regarding the need for anonymity." *United States v. Prado*, No. 10-CR-74 (JFB), 2011 U.S. Dist. LEXIS 86631, at *41 (E.D.N.Y. Aug. 5, 2011); *see e.g., United States v. Thai*, 29 F.3d 785, 801 (2d Cir. 1994) (where the court found that in order to provide a nonprejudicial reason for maintaining anonymity, the introduction to the *voir dire* questionnaire stated "[s]electing an anonymous jury is not an unusual practice and has been followed in many cases in Federal Court."); *United States v. Ashburn*, No. 13-CR-0303 (NGG), 2014 U.S. Dist. LEXIS 158657, at *11 (E.D.N.Y. Nov. 7, 2014) ("[A] defendant's fundamental rights must be protected by the court's conduct of a voir dire designed to uncover bias as to issues in the cases and as to the

defendant, and by taking care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities.").

If the court determines that an anonymous jury is warranted, it must take reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that the defendant's fundamental rights are protected. *Thai*, 29 F.3d at 801. These precautions typically include: (1) conducting a thorough *voir dire* to identify potential juror bias; (2) providing the jurors a plausible and nonprejudicial reason for not disclosing their identities; and (3) providing the defendant with as much information as possible about the prospective jurors without compromising their anonymity to obtain a fair and impartial jury. *See id.*; *United States v. Wong*, 40 F.3d 1347, 1377 (2d Cir. 1994).

**B.      ARGUMENT**

We submit that the Court should empanel a partially anonymous jury in this case due to the significant risks that the extraordinary level of media attention poses to juror impartiality, as well as their safety and privacy.

As noted above, the level of media coverage in this case is unprecedented and pervasive. Since December 2022, major New York media outlets have published an astounding number of articles mentioning Santos:

- *The New York Times*: 508 articles

- *New York Daily News*: 361 articles

- *New York Post*: 556 articles

- *Wall Street Journal*: 124 articles

Mancilla Decl. at ¶4.

This extensive media coverage weighs in favor of a partially anonymous jury due to the risk that revealing the jurors' names to the public could expose them to intimidation or harassment.  In *United States v. Paul Manafort*, the court granted the motion for the empanelment of a a partially anonymous jury not on the grounds that the defendant, a widely known individual due to his connections to a political figure, was particularly dangerous or had a history of interfering with the judicial process, but on the grounds that extensive publicity surrounded the defendant and the case.  *United States v. Paul Manafort,* 18-cr-83 (TSE) (E.D.V.A., August 21, 2018) (Ex. "B" to Mancilla Decl.).  The *Manafort* court stated that "[a]lthough the first four factors are inapplicable here, the final factor, (5) ["extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment."], makes clear the necessity of maintaining the jurors' and alternate jurors' anonymity from the public, given the extraordinary nature and extent of the media attention [...]  The extensive newspaper, internet, and television coverage of the trial underscore this necessity." *Id.*  The court further noted that "if jurors in very high-profile cases are not assured anonymity, at least for some period of time, they may be reluctant to serve." *Id.*  Reasonable safeguards were put into place by the court to minimize the risk the defendant's rights will be infringed, including the fact that the "parties are aware of the jurors' and alternate jurors' names and addresses." *Id.*

The media attention in Santos' case is not only extensive, but it is overwhelmingly negative and prejudicial, presenting a very real challenge to seating an impartial jury.  Media outlets have consistently portrayed Santos as a liar, fraud, and manipulator.[21]  The articles condemn him, writing "Santos lies like people breathe," and allege a multitude of "cons and

---

[21] *See*, December 1, 2023, *MSNBC*, "George Santos' time in the House of Representatives was 331 days too long." https://www.msnbc.com/opinion/msnbc-opinion/george-santos-expulsion-lies-congress-rcna127260

deceptions."[22]  Santos has been accused of being a "con artist" hundreds of times, and the *New Yorker* even published an article titled "George Santos and the Art of the Scam," linking Santos to other famous scammers.[23]  This negative portrayal extends beyond his professional life into personal matters, with the media commenting on his appearance and personal relationships. This level of scrutiny and negative portrayal creates a substantial risk that jurors, if identified, could face harassment or intimidation from members of the public who have formed strong opinions about Santos based on this media coverage.

Santos' status as a former congressman and his outspoken political views add another layer of complexity to this case.  The media has highlighted Santos' stance on divisive issues such as gun control and the Israel-Palestine conflict.  Santos' political positions combined with today's polarized political climate will likely cause  jurors to face backlash regardless of the verdict they render at trial.

This concern is even more critical given the fact that members of the potential jury pool may include Santos' former constituents from the Third Congressional District.  "Jurors may fear social ostracization and backlash from friends and family if they reach an unpopular verdict. They may want to avoid being seen publicly as on the wrong side of history. Jurors may also be justified in fearing that an unpopular or politically incorrect acquittal could damage their professional lives and reputations, leading to discrimination and career difficulties." Petersen, Silas J., *Countering Public Pressure: Jury Anonymity As a Protection of Criminal Defendants* [Note], Notre Dame Journal of Law, Ethics & Public Policy.  Given that Santos is charged in the area where he ran for Congress, the jurors will be selected out of the community that was the

---

[22] December 1, 2023, *Vanity Fair*, "George Santos Has Been Booted From Congress: A Look Back At His Most Absurd Lies and Cons." https://www.vanityfair.com/news/2023/01/george-santos-worst-lies
[23] December 14, 2023, *The New Yorker*, "George Santos and the Art of the Scam" https://www.newyorker.com/podcast/critics-at-large/george-santos-and-the-art-of-the-scam

direct audience of his campaign efforts, which are closely tied to the charges brought by the government here. Each jury member will have the pressure of their community on them during the trial and be subjected to harassment after a potential unpopular result of the trial. The jurors should not have to be confronted with the fear of risking their professional lives or reputations, and that fear should not influence their decisions while serving on this jury.

In Former President Trump's "hush money" case, *People of the State of New York v. Donald J. Trump*, the judge ordered for the empanelment of a partially anonymous jury where the names and addresses of the jurors would only be known by the parties and counsel. Ind. No. 71543/2023 (Supreme Court of New York, NY. County, March 7, 2024) (Ex. "C" to Mancilla Decl.). In order to "'minimize potential prejudice' to their client," Trump's attorneys requested that the jurors not be notified of the protective measures and be given "neutral explanations" if they ask about them.[24] The court noted that there was good cause to believe that there is a likelihood of harassment of the juror(s), and a protective order was appropriate given the high-profile, politically known defendant, as well as the expansive media coverage.

The presence of intense public outrage concerning a defendant militates in favor of juror anonymity. In *State of Minnesota v. Derek Chauvin*, the intense and divisive nature of the opinions concerning the defendant (who was charged with George Floyd's murder) led the court to empanel a fully anonymous jury. *State of Minnesota v. Derek Chauvin,* 27-CR-20-12646 (4th District of Minnesota, April 23, 2021) (Ex. "D" to Mancilla Decl.) Although there were no concerns that the defendant himself was dangerous, there was a fear that the jurors would be unable to render an impartial verdict given the nature of the case and the likelihood that they

---

[24] March 7, 2024, *NBC News*, Judge restricts access to jurors' identities in Trump hush money trial, https://www.nbcnews.com/politics/donald-trump/judge-restricts-access-jurors-identities-trump-hush-money-trial-rcna142348#

would be harassed or intimidated if they voted not guilty. The court sought to protect the twelve jurors from outside influence and to preserve Chauvin's right to a fair trial.[25] Given the "blazing spotlight" on the trial, the judge decided it was best to keep the names of the potential jurors unknown.[26]

Here, while Santos poses absolutely no danger to the jury, the extensive negative media attention surrounding this case and the vitriol that has followed, will unquestionably result in significant peer pressure for the jurors to vote guilty regardless of the evidence. Given this risk - that the extensive negative publicity will jeopardize the impartiality of any potential juror - this case presents the circumstances similar to the cases discussed above.

To address these concerns while protecting Santos' rights, we request that the Court implement the following measures:

1. Empanel a jury who remains anonymous to the public, but remains known to the parties, attorneys (and staff), and the Court to protect jurors from potential harassment, intimidation, or undue influence.

2. Provide jurors with a neutral explanation for their anonymity that does not negatively implicate the defendant, such as protecting their privacy from media intrusion, as suggested in *Prado*, No. 10-CR-74 (JFB), 2011 U.S. Dist. LEXIS 86631, at *9 (E.D.N.Y. Aug. 5, 2011).

---

[25] April 21, 2021, *AP News*, EXPLAINER: Chauvin jury could stay anonymous for a long time, https://apnews.com/article/derek-chauvin-jury-anonymous-638ebffa133473fa89516d824adca1d7

[26] April 26, 2021, *USA Today*, Anonymous jury in Derek Chauvin trial part of a growing trend that has some legal experts worried, https://www.usatoday.com/story/news/nation/2021/04/25/chauvin-trial-jury-anonymous-concerning-trend-us-justice/7342909002/

3. Conduct a thorough *voir dire* by first having the jury complete a written questionnaire followed by in-person questioning to identify potential biases related to Santos' political status or media coverage of his case (discussed further below).

4. Conduct individual *voir dire* at sidebar for sensitive topics to protect juror privacy and prevent tainting the entire panel, as done in *United States v. Brown*, 2022 U.S. Dist. LEXIS 177874, at *21-22.

These measures will help ensure a fair trial while protecting the safety and impartiality of the jury in this high-profile, politically charged case. The extraordinary circumstances surrounding Santos' case justify these precautions to safeguard the integrity of the judicial process. For these reasons, we respectfully request that the jury in this case be partially anonymous, confining disclosure of the jurors' identities to the parties, attorneys (and staff), and the Court.

## II.     MOTION FOR A JURY QUESTIONNAIRE

## A.     LEGAL STANDARD

"In selecting a jury, a trial court must take measures adapted to the intensity, pervasiveness, and character of the pretrial publicity and community animus." *Skilling v. United States*, 561 U.S. 358, 439 (2010). In cases that have attracted significant pretrial publicity, courts have recognized the need for more extensive *voir dire* procedures to ensure the selection of an impartial jury. *See United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006); *see also United States v. Loera*, 09-CR-466 (BMC), 2018 U.S. Dist. LEXIS 185689, 2018 WL 5624143, at *2 (E.D.N.Y. Oct. 30, 2018) (considering, in tailoring voir dire procedures, that "the amount of public attention" had been "extraordinary" and that "there are not many cases whose allegations are dramatized in popular television productions and podcasts before the trial [had] even begun").

District courts "routinely employ questionnaires to facilitate voir dire in a number of circumstances," including "where there has been extensive pre-trial publicity," to ensure that the defendant's rights are adequately protected. *United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007) (*citing Stewart*, 433 F.3d at 303); *see also United States v. Rahman*, 189 F.3d 88, 121-22 (2d Cir. 1999) (holding that a juror questionnaire "skillfully balanced the difficult task of questioning . . . a large jury pool with the defendants' right to inquire into . . . sensitive issues that might arise in the case"); *United States v. Avenatti*, 2021 U.S. Dist. LEXIS 125442, at *139 (S.D.N.Y. July 6, 2021); *Jovanovic v. City of New York*, No. 04-cv-8437, 2010 WL 8500283, at *12-13 (S.D.N.Y. Sept. 29, 2010) (use of a "juror questionnaire [that] asked questions relating to media coverage of [the] case" remedied potential prejudice caused by inflammatory statements made by the Assistant District Attorney to the press), *aff'd* 486 Fed. Appx. 149 (2d Cir. 2012);

*United States v. Sattar*, 395 F. Supp. 2d 66, 70 (S.D.N.Y. 2005) (using a 45-page juror

questionnaire "[d]ue to the extensive publicity surrounding this case"); *Steinberg v. Comm'r of*

*Corr. Servs.*, No. 92-cv-7907, 1998 WL 259948, at *5-6 & n.2 (S.D.N.Y. May 18, 1998)

(finding that "a questionnaire . . . used during voir dire to screen out those with possible

prejudice" was adequate to protect petitioner from publicity); *United States v. Muyet*, 945 F.

Supp. 586, 595 (S.D.N.Y. 1996) (endorsing the use of a "comprehensive jury questionnaire" in a

case involving extensive pre-trial publicity).

      The use of questionnaires in high-profile cases is also common outside of this district.

*See Skilling,* 561 U.S. at 370-71(district court used a 77-question, 14-page questionnaire to

provide "safeguards adequate to ensure an impartial jury"); *United States v. Poulsen*, 655 F.3d

492, 507-08 (6th Cir. 2011) (detailed juror questionnaire used with "questions addressing the

existence and extent of prospective jurors' media exposure and any opinions prospective jurors

may have formed about the case"); *United States v. Wecht*, 537 F.3d 222, 225-27 (3d Cir. 2008)

(juror questionnaire used in a case involving extensive media coverage); *United States v. Brown*,

303 F.3d 582, 602-03 (5th Cir. 2002) (42-page juror questionnaire used in a case involving

"enormous local and national publicity").

      The decision to employ a written questionnaire ultimately rests within the sound

discretion of the trial court. *United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007).

However, given the constitutional imperatives at stake and the challenges presented by high-

profile cases, courts are encouraged to consider all available tools to ensure the selection of an

impartial jury. *Skilling,* 561 U.S. at 384; *see also United States v. Nieves*, 58 F.4th 623, 643 (2d

Cir. 2023)("Because the district court's failure on *voir dire* to explore, or to take other steps

specifically to counter, such potential prejudice unfairly deprived Nieves of the opportunity to

unearth a pervasive bias relevant to an issue pivotal to the government's case against him, we hold that the district court abused its discretion.")

In light of these legal principles and the unique circumstances of this case, we respectfully submit that a written juror questionnaire is not only appropriate but necessary to protect Santos's right to a fair trial by an impartial jury.

## B.      ARGUMENT

### i.      A Written Questionnaire Is Necessary To Ensure A Fair And Impartial Jury

#### a.      Extensive Pretrial Publicity Necessitates Thorough Screening

This trial presents a unique combination of factors that demand an exceptionally thorough jury selection process, which must include a detailed questionnaire concerning potential jurors' knowledge, beliefs, and preconceptions regarding Santos' character and his guilt of the crimes charged.  Unlike typical high-profile cases, Santos' situation intertwines political controversy, complex financial crimes, and unprecedented media scrutiny in a manner that creates extraordinary challenges for seating an impartial jury.  The Second Circuit has acknowledged that a defendant's rights are especially at risk when "[t]he publicity [...] create[s] opinions of guilt long before trial, far removed from any safeguards against inadmissible matter." *United States v. Bloeth*, 313 F.2d 364, 372-73 (2d Cir. 1963).  The need for a juror questionnaire is especially great in this case because of the extensive media coverage surrounding Santos' alleged fraudulent activities, his election to Congress, and his subsequent removal.

Here, as discussed at length above, the media coverage surrounding Santos has been extensive and negative.  Mancilla Decl. at ¶¶ 4-5.  For all intents and purposes, Santos has already been found guilty in the court of public opinion.  Since December 2022, Santos has been relentlessly criticized by the media, often being branded as deceitful, fraudulent, a "liar,"

"fraud," and "con artist."[27]  This sentiment intensified post-indictment in May 2023, with major outlets posting numerous critical articles.[28]  His expulsion from Congress in December 2023 further fueled adverse publicity.[29]  Headlines and stories have delved into everything from his personal relationships to his physical appearance.[30]  The media has consistently scrutinized his personal life and political views while continuing to paint a picture of dishonesty and manipulation.[31]

"[I]n widely publicized or sensational cases, where the statements of trial participants are likely to appear in a widely disseminated manner there is a substantial likelihood that prospective jurors are unwittingly exposed to statements constituting prejudicial inadmissible evidence that would jeopardize the defendants' right to a fair trial.  To the extent that the Court has authority, it is the duty of the Court to prevent that kind of jury prejudice." *United States v. Simon*, 664 F. Supp. 780, 792-93 & n.15 (S.D.N.Y. 1987).  As "the [Supreme] Court's jurisprudence in this area makes clear, the most damaging type of publicity is that which shows or states that the defendant has committed the crime charged." *Bowers v. Walsh*, 277 F. Supp. 2d 208, 220-21 (W.D.N.Y. 2003) (*citing Sheppard v. Maxwell*, 384 U.S. 333 (1966)).

This pervasive and prejudicial publicity creates a substantial likelihood that potential jurors have been exposed to inadmissible and biased information, and have already formed a

---

[27] December 14, 2023, *The New Yorker*, "George Santos and the Art of the Scam" https://www.newyorker.com/podcast/critics-at-large/george-santos-and-the-art-of-the-scam

[28] *See*, May 10, 2023, *New York Times*, "George Santos's Spectacularly Dumb Alleged Scheme" https://www.nytimes.com/2023/05/10/opinion/george-santos-money-campaign.html?searchResultPosition=15

[29] *See*, May 11, 2023, *New York Daily News*, "Lying Congressman George Santos out on bail after not guilty plea to federal charges of fraud, theft of public funds, money laundering, false statements" https://www.nydailynews.com/2023/05/10/lying-congressman-george-santos-out-on-bail-after-not-guilty-plea-to-federal-charges-of-fraud-theft-of-public-funds-money-laundering-false-statements/

[30] November 19, 2023, *Rolling Stone*, "'SNL' Weekend Update Goes After George Santos' Botox, OnlyFans Grifts" https://www.rollingstone.com/tv-movies/tv-movie-news/snl-weekend-update-goes-after-george-santos-botox-onlyfans-grifts-1234886642/

[31] *See*, December 1, 2023, *MSNBC*, "George Santos' time in the House of Representatives was 331 days too long." https://www.msnbc.com/opinion/msnbc-opinion/george-santos-expulsion-lies-congress-rcna127260

negative opinion about Santos, thereby jeopardizing his right to a fair trial. The sheer volume and negative tone of the coverage underscore the need for a comprehensive approach to jury selection that includes the use of a written questionnaire to thoroughly screen potential jurors for exposure to such prejudicial information and preconceived notions of guilt.

Juror questionnaires will serve to address many concerns associated with pre-trial publicity and inherent, pre-existing biases. Extensive pre-trial publicity, as exists here, increases the difficulty of finding an objective jury pool and creates the risk that jurors will not be candid because they are embarrassed or unwilling to acknowledge potential biases in open court or afraid that their answers will be reported to the press. *See, e.g., United States v. Bruno*, 700 F. Supp. 2d 175, 178-79 (N.D.N.Y. 2010); *United States v. Stewart*, 317 F. Supp. 2d 432, 435 (S.D.N.Y. 2004). Questionnaires offer jurors the opportunity to be more candid with their responses than if questioned in open court. Jeffrey T. Frederick, *Mastering Voir Dire and Jury Selection* 114 (4th ed. 2018) ("The fact that the questioning of jurors often occurs in groups ranging from several jurors to twenty or more jurors leads to less disclosure and greater conformity to the opinions and behaviors expressed in these groups").

Recent precedent in the Eastern District of New York and the Second Circuit strongly supports the use of questionnaires in high-profile cases like Santos'. In *United States v. Raniere*, No. 18-CR-204 (NGG) (VMS), 2019 U.S. Dist. LEXIS 110735, at *6 (E.D.N.Y. July 2, 2019) , a case involving charges of racketeering and sex trafficking that garnered significant media attention, Judge Nicholas G. Garaufis employed a comprehensive 40-page questionnaire to screen potential jurors. The Court recognized that the extensive pretrial publicity and sensitive nature of the charges necessitated a more thorough *voir dire* process.

Similarly, in *United States v. Loera*, No. 09-cr-0466 (BMC), 2019 U.S. Dist. LEXIS 111566, at *3 (E.D.N.Y. July 3, 2019), better known as the El Chapo trial, Judge Brian M. Cogan utilized a detailed 36-page questionnaire to address concerns about juror safety and impartiality in a case that had received international media coverage. The questionnaire proved instrumental in identifying potential biases and ensuring a fair trial despite the intense public interest. *Id.*

These recent examples demonstrate that courts in this jurisdiction recognize the value of questionnaires in cases attracting significant media attention. They underscore the growing trend of using this tool to ensure a fair and efficient jury selection process in complex, high-profile cases like Santos'.

**b.      Efficiency Of The Trial Process**

There is also the practical consideration that selecting an impartial jury in a highly publicized case will require a more extensive examination of a larger pool of potential jurors. *See, e.g., Rahman*, 189 F.3d at 121-22; *Bruno*, 700 F. Supp. 2d at 178-79. A written questionnaire would allow for a more thorough and efficient screening of potential jurors, helping to identify those who may have been unduly influenced by pretrial publicity. The questionnaire would provide a means to probe jurors' exposure to media coverage and their ability to set aside any preconceived notions, a task that is crucial in high-profile cases such as this. For all of these reasons, a juror questionnaire is a helpful "pre-screening measure" that will "expedite selection." *Bruno*, 700 F. Supp. 2d at 178.

A written questionnaire would significantly streamline the voir dire process. *United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007) (noting that questionnaires can expedite jury selection). This is particularly true if the Court employs its procedure to provide the

questionnaires to the potential jurors prior to *voir dire* so that the jurors may complete the questions on their own time.[32]  This efficiency is particularly important given the expected length and complexity of the trial.

A questionnaire in this case will conserve the Court's and the jurors' time and resources by allowing the parties to analyze potential jurors' answers in advance. *See Rahman*, 189 F.3d at 121-22 (using a juror questionnaire in a high-profile case to screen a large jury pool); *Bruno*, 700 F. Supp. 2d at 178-79 (same); *United States v. Awadallah*, 457 F. Supp. 2d 246, 254 (S.D.N.Y. 2006) (same); *see also United States v. Wilson*, 925 F. Supp. 2d 410, 411-13 (E.D.N.Y. 2013) (using a juror questionnaire "to root out any and all bias," including any "exposure to the news coverage on this case").  Challenges for cause will be resolved more quickly, peremptory challenges will be faster, and side-bar questioning will require less time.

Finally, a questionnaire would also protect the jurors' anonymity were the Court to agree to a partially anonymous jury as requested. *United States v. Guzman Loera*, No. 09-cr-0466 (BMC), 2018 U.S. Dist. LEXIS 185689, at *18 (E.D.N.Y. Oct. 30, 2018)("the questionnaire process was designed to protect the jurors' anonymity").

---

[32]  *See U.S. v. Tarantino*, 08-CR-0655 (JS) (E.D.N.Y. Jan. 21, 2011) ("This Court's procedure on written questionnaires for an anonymous jury is to have the Clerk's Office send summonses to several hundred potential jurors to come to the courthouse to fill out the questionnaire. Potential jurors return only if requested. The attorneys for the Government and Defendant are given copies of the completed questionnaires and advised to review the responses, to discuss the questionnaires with each other, and to agree on potential jurors who should be called back to the courthouse for jury selection. The Court then meets with counsel to see if any person who completed the questionnaire should not be called. Those jurors that did not have language issues, a physical or mental impairment, a stated bias in their responses, or for whom the Court does not initially find a basis for a potential "for cause" challenge are summoned for jury selection to be conducted in Defendant's presence.")

ii.    **The Proposed Areas Of Inquiry In The Questionnaire Are Directly Relevant To The Potential Biases and Risks Present By Virtue Of The High Profile Nature Of This Case**

Here, the proposed questionnaire contains 137 questions and 17 pages, which is reasonable in light of questionnaires used in other criminal cases:

| Case | Number of Questions Asked | Pages |
|------|---------------------------|-------|
| *Texas v. Billy Joe Shaver* | 15 | 1 |
| *Michigan v. Jack Kevorkian* | 60 | 12 |
| *United States v. Oliver North* | 36 | 13 |
| *Connecticut v. Michael Skakel* | 69 | 16 |
| *California v. Philip Spector* | 108 | 18 |
| *Colorado v. James Holmes* | 77 | 18 |
| *Kansas v. Scott Roeder* | 88 | 20 |
| *United States v. Marion Barry* | 69 | 25 |
| *United States v. Timothy James McVeigh* | 158 | 40 |
| *United States v. MAJ Nidal Hasan* | 232 | 51 |
| *California v. O.J. Simpson* | 303[33] | 87 |

Jeffrey T. Frederick, *Mastering Voir Dire and Jury Selection* at 203 (Table 7.1) (4th ed. 2018).

---

[33] Due to misnumbering of questions, the total number of questions was 303 instead of the numbering of 294 that appears on the questionnaire.

Additionally, the questionnaire specifically includes the following critical areas of inquiry:

**a.    Exposure to media coverage related to the case**

Questions 23-32 extensively probe potential jurors' media consumption habits and their specific exposure to coverage of this case.  Ex. A. at 3-4, Mancilla Decl.  This is crucial given the extraordinary level of media attention surrounding Santos, with major New York media outlets publishing hundreds of articles about him. Mancilla Decl. at ¶4.  For instance, question 30 asks jurors to recall specific details that they have heard about the case, allowing the court to assess the depth and potential prejudice of their pre-trial knowledge. Ex. A at 4.

**b.    Knowledge of the defendant, witnesses, and parties involved**

Questions 33-42 delve into jurors' familiarity with Santos himself, including any pre-existing opinions they may have formed. Ex. A. at 4-5, Mancilla Decl.  This is particularly relevant given the widespread negative portrayal of Santos in the media, with outlets describing him as a "liar," "fraud," and "con artist."[34]  Question 40, for example, directly asks if jurors have formed opinions about Santos based on media coverage. Ex. A. at 5, Mancilla Decl.

**c.    Political affiliations and potential biases**

Given Santos' status as a former congressman and the political nature of the alleged crimes, questions 49-62 explore jurors' political views, affiliations, and potential biases. Ex. A. at 6-7, Mancilla Decl.  This section includes inquiries about jurors' opinions on Congress and politicians in general, which is crucial given the potential for pre-existing biases against political figures in today's highly divisive and polarized political climate.

---

[34] December 14, 2023, *The New Yorker*, "George Santos and the Art of the Scam" https://www.newyorker.com/podcast/critics-at-large/george-santos-and-the-art-of-the-scam

**d.** **Understanding of financial crimes and relevant legal concepts**

Questions 84-95 assess jurors' familiarity with concepts related to the charges, such as campaign finance laws, the Federal Election Commission, and various types of fraud. Ex. A. at 11-12, Mancilla Decl. This knowledge is important to gauge as it may influence jurors' ability to understand and fairly evaluate the evidence presented.

Finally, the questionnaire includes critical inquiries regarding the jurors' ability to follow legal instructions (questions 110-117) and their understanding of juror rights and responsibilities (questions 118-134). These sections are vital in ensuring that selected jurors can set aside any preconceived notions they may have gathered from the negative publicity surrounding Santos and decide the case based solely on the evidence presented in court.

By covering these areas comprehensively, the proposed questionnaire directly addresses the potential biases and risks inherent in this high-profile case, allowing for a more thorough and efficient jury selection process.

## CONCLUSION

The extraordinary confluence of this case's high-profile nature, the pervasive and overwhelmingly negative media coverage it has generated, and its intersection with the current, deeply polarized political climate necessitates both a partially anonymous jury and a comprehensive written questionnaire to ensure the selection of a fair and impartial jury. For the foregoing reasons, Santos respectfully requests that the Court grant the requested relief.

Dated: August 6, 2024
New York, New York

MANCILLA & FANTONE LLP

By: */s/ Andrew Mancilla*
Andrew Mancilla, Esq.
260 Madison Avenue – 22nd Floor
New York, New York 10016

Phone: (646) 225-6686
Fax: (646) 655-0269
andrew@law-mf.com

By: */s/ Robert Fantone*
Robert Fantone, Esq.
robert@law-mf.com

**JOSEPH W. MURRAY, ESQ.**

By: */s/ Joseph Murray*
Joseph Murray, Esq.
 185 Great Neck Road, Ste. 461
Great Neck, New York 11021
(646) 838 – 1702
joe@jmurray-law.com

To:  All parties of record via ECF