

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*610 Federal Plaza*
*Central Islip, New York 11722*

RCH:AXB/LZ
F. #2022R01030

August 9, 2024

By ECF

The Honorable Joanna Seybert
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re: United States v. Devolder Santos
           Criminal Docket No. 23-197 (S-2) (JS)

Dear Judge Seybert:

      The government respectfully submits this letter in response to defendant George Anthony Devolder Santos's motion (the "Motion" or "Mot.") for a partially anonymous jury and a juror questionnaire in the above-referenced case. See ECF No. 95. The government defers to the Court's discretion as to whether to partially anonymize the jury. It opposes the use of a juror questionnaire for the reasons set forth below.

    I.    Santos's Request for a Partially Anonymous Jury

      As reflected in the Motion, the government does not object to Santos's request that the identities of prospective and seated jurors be disclosed only to the Court and the parties and attorneys in this case. See Mot. 1, 7. Rather, it defers to the Court's sound discretion in determining whether partially anonymizing the jury is warranted under the facts and circumstances of this case.

    II.    Santos's Request for a Juror Questionnaire

      The government opposes Santos's request to require prospective jurors to complete the 137-item questionnaire attached to the Motion, or any juror questionnaire.

      A.    Legal Standards

      "[T]he obligation to impanel an impartial jury lies in the first instance with the trial judge." Rosales-Lopez v. United States, 451 U.S. 182, 189 (1981). It is well-established

that because federal judges "must rely largely on [their] immediate perceptions" to impanel an impartial jury, district courts "have been accorded ample discretion in determining how best to conduct the voir dire." Id. (citing cases); United States v. Harding, 273 F. Supp. 2d 411, 429 (S.D.N.Y. 2003) (same); see also United States v. Quinones, 511 F.3d 289, 299 (2d Cir. 2007). Accordingly, "[w]hether to use a jury questionnaire is within the discretion of the Court." United States v. Tomero, 486 F. Supp. 2d 320, 324-25 (S.D.N.Y. 2007) (citing cases); see also, e.g., United States v. Treacy, 639 F.3d 32, 47 (2d Cir. 2011) (court did not abuse discretion in denying request for juror questionnaire); United States v. Salameh, 152 F.3d 88, 120-21 (2d Cir. 1998) (same). The Second Circuit thus "will not interfere with the manner in which the district court has chosen to conduct voir dire unless an abuse of discretion is 'clear.'" Treacy, 639 F.3d at 46; see also id. ("Although we have approved the use of questionnaires as one of many tools available for voir dire, we have expressly declined to hold that district judges are ever obligated to make use of this procedure in selecting juries.") (internal quotations and citation omitted).

  B.  Argument

For the reasons set forth below, this Court should exercise its discretion to deny Santos's request to administer a juror questionnaire.

  1.  A Questionnaire Is Unfeasible at This Juncture

Santos's request should be denied because administering a juror questionnaire at this late juncture is unfeasible. Jury selection for Santos's trial was scheduled approximately nine-and-a-half months ago, on October 27, 2023. See ECF No. 53. In reliance upon that schedule, the government understands that approximately 850 prospective jurors have already been summoned to appear at the courthouse on September 9 for the start of Santos's trial. The government is aware of no mechanism to require those jurors to appear at an earlier time for the purpose of completing a questionnaire; Santos's request, therefore, is effectively to adjourn the trial, since the only way to grant his requested relief is to require the summoned jurors to complete a questionnaire on September 9 and then return at some unknown date in the future for jury selection.[1] The problems with such an outcome are self-evident. The government has

---

[1]  As Santos at least tacitly acknowledges, see Mot. 21 n.32, if a questionnaire were to be administered in this case, the process would entail: summoning prospective jurors to the courthouse to read through and complete the juror questionnaire; review of the juror questionnaires by the Court, the defendant and his counsel, and the government to determine which jurors, if any, should be removed from the venire for cause; and oral voir dire, which would likely involve follow-up questions to clarify the answers provided on the questionnaires. Indeed, the risk of cumulative questioning stems from the Second Circuit's explicit recommendation that, even where written questionnaires are used, oral voir dire still occur unless "[i]rrevocable bias [is] so evident from the[] written responses as to render superfluous further oral inquiry about the juror's ability to follow legal instructions and to serve impartially." Quinones, 511 F3d. at 302. This three-step process would likely take at least several days, if not longer. An oral voir dire, by contrast, would eliminate the first two steps.

expended, and will continue to expend, significant time and resources in preparation for its case-in-chief on the timeline set by the Court nine-and-a-half months ago. Moreover, setting aside the Court's schedule—which presumably has been arranged to accommodate a September 9 trial date—the government has required dozens of witnesses to disrupt their personal and professional lives to testify throughout the month of September, many of whom have to travel to the district solely for that purpose and have, or are in the process of obtaining, flights and lodging. And that is to say nothing of the victims in this case, who have waited more than a year for their day in court. In the Motion, Santos offers no explanation for his failure over the preceding nine months to seek discretionary relief related to jury selection, let alone one that is sufficient to justify the major interruption in these proceedings that his belated request for relief would cause. The Motion should be denied on this basis alone.

2. <u>Anticipated Media Attention Does Not Warrant a Questionnaire</u>

The impropriety of granting Santos's request is especially clear in light of what Santos *has* spent the past nine months doing, namely, courting the press and ginning up the very media attention he now laments may unfairly influence jurors. In this regard, Santos contends that a juror questionnaire is appropriate to counter the "extensive media coverage" surrounding him. <u>See</u> Mot. 17. His argument is meritless at best and disingenuous at worst.

As this Court has recognized on several prior occasions, the media environment surrounding Santos is largely a product of his own making. His attempt to complicate and delay these proceedings through the use of a lengthy, cumbersome, and time-consuming questionnaire is yet another example of Santos attempting to use his public persona as both a sword and a shield. The Court must not permit him to do so.

In its June 20, 2023, Memorandum & Order, this Court rejected Santos's argument that the identities of his sureties should remain sealed due partly to the purported "media frenzy" that surrounds this case. <u>See</u> ECF No. 17 at 2. In doing so, the Court rightly noted that Santos had invited precisely the attention he received:

> [I]t is disingenuous for Defendant to maintain that the self-characterized media frenzy, or the purported vitriolic reactions which Defendant encountered surrounding his Indictment, risk inhibiting the Suretors' ability to fulfill their supervisory role. The Suretors did not come before the Court until May 15, 2023, five days after Defendant's highly publicized arraignment and plea; it is spurious to contend that the Suretors were unaware of the media reaction that had occurred earlier. At that time, Defendant did nothing to diffuse the "media frenzy"

---

Jury selection would thus begin with the oral questioning of prospective jurors and the parties could propose juror strikes the same day. Such a process would lead to the same outcome: the selection of a fair and impartial jury.

when leaving the courthouse, instead choosing to address the
numerous reporters awaiting his departure.

ECF No. 27 at 8.

On April 24, 2024, the Court again had occasion to address Santos's self-serving relationship with the media, this time in the context of Santos's efforts to unseal and selectively disseminate (to the press) certain Confidential Discovery Materials. See ECF No. 65 (motion), 70 (opinion). In denying such relief the Court agreed with the government's observation that, contrary to Santos's claims, the protective order governing sensitive discovery in this case had not prevented Santos from publicly commenting upon the charges:

> The Government provides numerous other instances of Santos opining as to the charges alleged in the Superseding Indictment and his defenses on each of those charges. (See, e.g., Opp'n at 8-9.) The Court does not repeat them here, but simply notes its agreement with the Government that Defendant has not been coy in exercising his First Amendment rights.

See ECF No. 70 at 7 n.7.

Against this backdrop, Santos's stated concerns about media coverage infiltrating the jury pool ring hollow. Indeed, far from taking precautionary steps to mitigate the impact of such publicity on prospective jurors, Santos—as he has done throughout these proceedings—spent much of the approximately nine months since his trial was scheduled making media appearances and publicly commenting upon this case. For example, on or about December 18, 2023 (approximately two months after jury selection was scheduled), Santos gave a televised interview with late-night talk show host Ziwe, in which Santos boasted that he would continue making public appearances because "people want the content." Ziwe, George Santos Answers Hard-Hitting Questions | Ziwe Interview, at 15:49-15:56, YOUTUBE (December 18, 2023), https://www.youtube.com/watch?v=PjbkafIMdl8, last visited August 9, 2024. And on January 10, 2024, Santos participated in a televised interview with Piers Morgan, in which he made a direct appeal to people "back home," i.e., potential jurors in the Eastern District of New York: "I've given many people a second chance, and I'm asking everybody please give me a second chance . . . We all make mistakes if you really take a look deep inside, and I am sorry." Piers Morgan Uncensored, Piers Morgan vs George Santos | 'I Can't Explain My Lying,' at 1:15:38-1:16:00, YOUTUBE (January 10, 2024), https://www.youtube.com/watch?v=c3_2ESd1evI, last visited August 9, 2024. These are but two of the numerous instances (too many to fully recount here) in which Santos, who now claims to be the victim of an overzealous media, actively courted the attention he has received.

Stripped of context, the instant Motion reads as though Santos, despite his best efforts to maintain privacy, has been involuntarily thrust into the limelight. But this Court knows precisely the opposite is true. The Motion estimates the total number of news articles featuring Santos to be north of 1,500. See Mot. 3. But Santos stops short of analyzing how many of those stories described press appearances that Santos voluntarily (and in many cases,

4

eagerly) gave. Nor does it attempt to distinguish between the type of "extensive and negative" coverage the Motion claims to condemn from, for instance, stories covering Santos's deliberate publicity stunts, including his many media appearances. Surely such coverage, despite reflecting Santos's deliberate and self-serving attempts to gain notoriety, comprises a significant portion of his overall media footprint. He should not be rewarded for such conduct by now bogging down the trial with a juror questionnaire supposedly aimed at "screen[ing] potential jurors for exposure to" the very press attention that he has played a leading role in creating and fostering. Mot. 19.

In contrast, the government has not made a single public statement about this case outside of judicial filings since its press release announcing the superseding indictment on October 10, 2023, i.e., before the trial was scheduled. And since then, the government has actively fought back Santos's efforts to litigate this case in the media. See ECF No. 68 at 6 (arguing, approximately four months ago, that Santos was "attempt[ing] to selectively weaponize discovery materials to influence public opinion on this matter—including prospective jurors," in "a transparent effort to litigate this matter in the press rather than in the courtroom."). Santos, on the other hand, has shown an unwillingness to shy away from publicity, appearing on Piers Morgan Uncensored to offer political commentary as recently as July 24, 2024—less than three weeks before filing the instant motion bemoaning the media's interest in him.

To be sure, this case has garnered significant media attention and one factor in evaluating the necessity of a juror questionnaire is "where there has been extensive pre-trial publicity." Quinones, 511 F.3d at 299. But that fact alone is not dispositive and there is no basis here to conclude that a customary voir dire process will fail to properly screen for pretrial bias, as it has in other high-profile cases, such as the recent trial of U.S. Senator Robert Menendez. See United States v. Menendez, No, 23-CR-490 (SHS) (S.D.N.Y. Apr. 22, 2024) (ECF No. 344 at 64-65) (denying defense request for juror questionnaire in prosecution of Senator Robert Menendez); see also United States v. Hadden, No. 20-CR-468 (RMB) (S.D.N.Y. Jan. 20, 2022) (ECF No. 151 at 1) (denying defense request for juror questionnaire as "not necessary to select a fair and impartial juror in this case" and noting the Court's practice of conducting trials, "including those trials involving pretrial publicity," without using a juror questionnaire); United States v. Doud, No. 19-CR-285 (GBD) (S.D.N.Y. Jan. 10, 2022) (ECF No. 134 at 86) (a juror questionnaire was inefficient and not "necessary" because the court could "adequately address the issues" and questions for the potential jurors, and concluding that the case was not "so unique[] that it would warrant a jury questionnaire" and that the "nature of the questions in the jury questionnaire are pretty much the questions that I can ask as a group of the jurors and have them indicate whether they have some response and follow-up questions with those jurors."); United States v. Ray, No. 20-CR-110 (LJL) (S.D.N.Y. Jan. 6, 2022) (ECF No. 290 at 4) (a juror questionnaire would not be "appropriate" and that "the way to ensure a fair and impartial jury for every party is to conduct oral voir dire and not to use a jury questionnaire."); United States v. Parnas, No. 19-CR-725 (JPO) (S.D.N.Y. Oct. 5, 2021) (ECF No. 275 at 13) (denying defense request for written questionnaire, finding that "questioning the potential jurors in person is more reliable and efficient"); United States v. Shkreli, 260 F. Supp. 3d 257, 259 (E.D.N.Y. 2017) (denying defense request for written

questionnaire in the prosecution of "Pharma Bro" Martin Shkreli, and electing instead to ask voir dire questions orally); United States v. Smith, No. 13-CR-297 (KMK) (S.D.N.Y. Dec. 18, 2014) (minute entry denying motion for questionnaire in criminal trial of former State Senate Leader Malcolm Smith).

Contrary to Santos's contentions, there is no apparent reason to treat his case any differently than those cited above. His efforts to analogize himself to figures like O.J. Simpson, Jack Kevorkian, and Joaquin "El Chapo" Guzman, see Mot. 20, 22, strain credulity. In actuality, Santos was a member of the House of Representatives for less than one year and was largely unknown to the public before his election. The government cannot identify any non-speculative basis to conclude that the Court's usual voir dire procedures will be insufficient to select a fair and impartial jury, and Santos identifies none. See United States v. Harding, 273 F. Supp. 2d 411, 429 (S.D.N.Y. 2003) (denying defense request for written questionnaire where defendant "failed to demonstrate that use of a written questionnaire is necessary or preferable to a proper voir dire conducted by the Court."). As such, the Motion should be denied on this alternative basis.

### 3. A Questionnaire Will Not Provide a Better or More Efficient Voir Dire

Nor would a juror questionnaire—especially at this late juncture—"streamline the voir dire process," as Santos suggests. Mot. 20. On the contrary, a juror questionnaire would be cumbersome and inefficient. As many other courts have recognized, administering a questionnaire will simply prolong jury selection and lead to an undue waste of judicial resources that is neither in the interest of the public nor of the prospective jurors. See, e.g., Menendez, No. 23-CR-490 (SHS) (ECF No. 344 at 64-65) ("I don't really find that [juror questionnaires] are terribly helpful."); Parnas, No. 19-CR-725 (JPO) (ECF No. 275 at 13) ("I'm not planning to do a written questionnaire in this case. I find that questioning the potential jurors in person is more reliable and efficient. And I will ensure that a fair jury is selected."); see also Treacy, 639 F.3d at 36 ("I never give [juror questionnaires], ever. I did it once, and it was the biggest mistake I ever made."; "The[re are] many problems with questionnaires, but the single biggest problem [ ] is that there is no one in the world who can draft a question that will not have ambiguities that will be, as I learned the one time [I] tried it, that will be picked up on by various prospective jurors. And thus during the voir dire, a huge amount of time will be spent explaining to a juror why he or she misunderstood the question in the questionnaire or finding out that . . . the way he interpreted it was not the way the lawyers interpreted it.") (internal quotations and citation omitted).

As this Court well knows, the customary practice in this district is oral voir dire and that process is a time-tested method for selecting a fair and impartial jury. The process works, and it has been used time and again, even in cases that have garnered significant media attention. See supra 5-6. Indeed, as evidenced by Santos's reliance on cases spanning several decades from state and federal courts around the country (a search that still only yielded 11 cases Santos claims are comparable, see Mot. 22), written questionnaires have been administered only in rare cases and in circumstances that are not present here. The

6

government's deference to the Court on partially anonymizing the jury does not alter this conclusion.  It is true that courts have sometimes used written questionnaires as a result of the decision to empanel an anonymous jury, see, e.g., United States v. Thai, 29 F.3d 785, 800-01 (2d Cir. 1994) (discussing the use of a written jury questionnaire in selecting an anonymous jury as a result of, among other things, two defendants having threatened and killed a civilian witness), but no such concerns are present where, as here (if the Court grants the defendant's motion), the identities of the jurors will be known to the parties and the Court.  Under those circumstances, the partial anonymization of the jury by withholding their identities from the public has no bearing on the helpfulness of a questionnaire in rooting out potential bias.

        Rather, Santos's right to a fair and impartial jury can be adequately—indeed, best—protected through the Court's voir dire and jury instructions.  Beyond Santos's speculation, there is no discernible reason to believe that jurors will be more comfortable committing their personal experiences and views to paper, as opposed to sharing them with the Court, including at sidebar.  Just the opposite.  Instead, it would be preferable for the Court in the first instance and in person to pose questions to potential jurors, at sidebar where warranted.  In-person questioning would allow the Court and the parties to directly assess the jurors and their responses—and, with the Court's leave, to ask follow-up questions on the spot. See Rosales-Lopez, 451 U.S. at 189.  A careful and thoughtful approach to jury selection can certainly be achieved through this Court's proper voir dire.

III. Conclusion

For the reasons set forth above, the government defers to the sound discretion of the Court in determining whether to partially anonymize the jury but opposes the use of a juror questionnaire in this case.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     */s/*
Ryan C. Harris
Anthony Bagnuola
Laura Zuckerwise
Assistant U.S. Attorneys

COREY R. AMUNDSON
Chief, Public Integrity Section
U.S. Department of Justice

By:     */s/*
Jacob R. Steiner
John P. Taddei
Trial Attorneys

cc:     Clerk of Court (JS) (via ECF and email)
       Counsel of Record (via ECF and email)